**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS and SAN FRANCISCO CRAB BOAT OWNERS ASSOCIATION, INC,**<br><br>        **Plaintiffs,**<br><br>        **v.**<br><br>**UNITED STATES DEPARTMENT OF THE INTERIOR and UNITED STATES BUREAU OF RECLAMATION,**<br><br>        **Defendants,**<br><br>        **and**<br><br>**WESTLANDS WATER DISTRICT, SAN LUIS WATER DISTRICT, and PANOCHE WATER DISTRICT,**<br><br>**Intervenor Defendants.** | **1:12-CV-01303-LJO-MJS**<br><br>**MEMORANDUM DECISION AND ORDER RE MOTIONS TO DISMISS (DOCS. 45 & 46)** |

## I. INTRODUCTION

This case concerns approval by the United States Department of the Interior and its member

agency the United States Bureau of Reclamation (collectively, "Federal Defendants," "Reclamation," or

the "Bureau") of eight (8) interim renewal contracts ("Interim Contracts") which authorize delivery of

water from federal reclamation facilities to certain water districts served by the federal Central Valley

Project ("CVP") and provide for repayment of capital construction costs, as well as operational and

maintenance expenses associated with CVP facilities. First Amended Complaint ("FAC"), Doc. 47 at ¶

2. Plaintiffs allege that Federal Defendants' issued a deficient Environmental Assessment ("EA") and

associated Finding of No Significant Impact ("FONSI") prior to approval of the Interim Contracts in

violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*. Plaintiffs also

allege that Federal Defendants should have prepared an Environmental Impact Statement ("EIS"), rather

1

than an EA/FONSI, in connection with approval of the Interim Contracts.

Before the Court for decision is Federal Defendants' motion to dismiss the FAC pursuant to Fed. R. Civ. P. 12(b)(1), (6), and/or (7). Doc. 45. Intervenor Defendants Westlands Water District, San Luis Water District, and Panoche Water District join the Federal Defendants and add one unique argument to the dispute. Doc. 46. Plaintiffs oppose. Doc. 48. The Bureau and Defendant Intervenors replied. Docs. 49 & 50. The motions were taken under submission on the record without a hearing pursuant to Local Rule 230(g). Doc. 43 at 2.

## II. <u>BACKGROUND</u>

The CVP is "a system of dams, reservoirs, levees, canals, pumping stations, hydropower plants, and other infrastructure that distributes water throughout California's vast Central Valley." *San Luis Unit Food Producers v. United States*, --- F.3d ---, 2013 WL 765206, *1 (9th Cir. Mar. 1, 2013) (internal citation and quotation omitted). "The Bureau is the agency within the Department of the Interior charged with administering the CVP." *Id.*

> Congress initially prioritized the purposes of the CVP as follows: "[T]he said dam and reservoirs shall be used, first, for river regulation, improvement of navigation, and flood control; second, for irrigation and domestic uses; and, third, for power." CVP Act § 2 (1937) (emphasis added). However, Congress amended the CVP Act in 1992 with the Central Valley Project Improvement Act, Pub. L. No. 102–575, 106 Stat. 4600 ("CVPIA"), which re-prioritized the purposes of the CVP. *O'Neill v. United States*, 50 F.3d 677, 686 (9th Cir. 1995). The hierarchy of purposes now reads, "[T]he said dam and reservoirs shall be used, first, for river regulation, improvement of navigation, and flood control; second, for irrigation and domestic uses and fish and wildlife mitigation, protection and restoration purposes; and, third, for power and fish and wildlife enhancement." CVPIA § 3406(a)(2) (emphasis added); CVP Act § 2. The CVPIA also requires that the Bureau operate the CVP to "meet all obligations under State and Federal law, including but not limited to the Federal Endangered Species Act, 16 U.S.C. 1531, et seq." CVPIA § 3406(b).

*Id.* at *2.

The CVPIA also provides for renewal of existing long-term water service contracts for successive periods of up to 25 years. CVPIA § 3404(c)(1), Pub. L. No. 102–575, 106 Stat. 4600 (1992).

The CVPIA specifically called for completion of a programmatic EIS pursuant to NEPA that would analyze

> the direct and indirect impacts and benefits of implementing this title, including all fish, wildlife, and habitat restoration actions and the potential renewal of all existing Central Valley Project water contracts. Such statement shall consider impacts and benefits within the Sacramento, San Joaquin, and Trinity River basins, and the San Francisco Bay/Sacramento-San Joaquin River Delta Estuary.

CVPIA § 3409. Renewal of any long-term (i.e., 25-year) contract may not be authorized by Reclamation "until appropriate environmental review, including the preparation of the [PEIS] required in section 3409... has been completed." CVPIA § 3404(c)(1). This requirement culminated in adoption of the Central Valley Project Improvement Act Final Programmatic Environmental Impact Statement ("CVPIA PEIS"), which was completed in 1999. FAC at p.12. In addition, Reclamation began the process of preparing project-level EISs for long-term contract renewals for the West San Joaquin Division and San Luis Contractors. *Id.* In September 2005, Reclamation prepared and released a draft EIS for these long-term contract renewals, but no final EIS has yet been adopted. *See id.*

The CVPIA provides for the eventuality that long-term contracts might expire prior to completion of appropriate environmental review:

> Contracts which expire prior to the completion of the environmental impact statement required by section 3409 may be renewed for an interim period not to exceed three years in length, and for successive interim periods of not more than two years in length, until the environmental impact statement required by section 3409 has been finally completed, at which time such interim renewal contracts shall be eligible for long-term renewal as provided above. Such interim renewal contracts shall be modified to comply with existing law, including provisions of this title.

CVPIA § 3404(c)(1).

On or about February 29, 2012, Reclamation issued a FONSI and EA regarding the "Three Delta Division and Five San Luis Unit Water Service Interim Renewal Contracts 2012-2014." FAC ¶ 25. These documents purport to "tier" off of the CVPIA PEIS. Doc. 4-1, FONSI at 2.[1] Based on the FONSI

---

[1] The FONSI and EA, Doc. 4-1, are public records subject to judicial notice for their content. *See Ctr. for Envtl. Law &*

1    and EA, Reclamation approved the eight Interim Contracts at issue in this case.[2] *Id*. Water delivery

2    pursuant to the new two-year Interim Contracts commenced on March 1, 2012. *Id*.

3

4                                    **III. DISCUSSION**

5    **A.    Waiver.**

6              **1.       Standard of Decision.**

7              Federal Defendants appear to invoke Federal Rule of Civil Procedure 12(b)(1), which provides

8    for dismissal of an action for "lack of subject-matter jurisdiction," to argue that the FAC should be

9    dismissed because Plaintiffs' failed to exhaust their administrative remedies. Although "[t]here is some

10   uncertainty regarding whether a failure to exhaust administrative remedies is properly brought in a Rule

11   12(b)(1) motion as a jurisdictional defect, or in a Rule 12(b)(6) motion for failure to state a claim," *Hall*

12   *v. Sebelius*, 689 F.Supp.2d 10, 21-22 (D.D.C. 2009) (citing cases), the Ninth Circuit appears to treat

13   failure to exhaust under the Administrative Procedure Act ("APA")[3] as a "legal question," subject to

14   Rule 12(b)(6), rather than as a jurisdictional issue, *see Nw. Envtl. Advocates v. E.P.A.*, 537 F.3d 1006,

15   1014 (9th Cir. 2008) (distinguishing between review of questions of subject matter jurisdiction and the

16   "legal question of whether a plaintiff has exhausted the necessary administrative remedies").

17

18             Dismissal under Rule 12(b)(6) is proper where there is either a "lack of a cognizable legal

19   theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balisteri v. Pacifica*

20   *Police Dept*., 901 F.2d 696, 699 (9th Cir. 1990). In considering a motion to dismiss for failure to state a

21   claim, the court generally accepts as true the allegations in the complaint, construes the pleading in the

22   light most favorable to the party opposing the motion, and resolves all doubts in the pleader's favor.

23

24

25   *Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1010 n. 5 (9th Cir. 2011) (taking judicial notice of draft EIS).
     [2] The Interim Contracts are with the City of Tracy, Pajaro Valley Water Management Agency, Santa Clara Valley Water
26   District, Westlands Water District, Westlands Water District Distribution District #1, and Westlands Water District
     Distribution District #2. FAC at ¶ 25.
27   [3] Because NEPA does not provide a private right of action, NEPA claims must be brought under the APA. *Cetacean Cmty. v.*
     *Bush*, 386 F.3d 1169, 1179 (9th Cir. 2004); *Cent. Delta Water Agency v. U.S. Fish & Wildlife Serv.*, 653 F. Supp. 2d 1066,
28   1089 (E.D. Cal. 2009).

                                                       4

*Lazy Y. Ranch LTD v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008). To survive a 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Even if this aspect of Federal Defendants' motion is subject to the Rule 12(b)(1) standard, this would be of little practical import. Faced with a Rule 12(b)(1) motion, a plaintiff bears the burden of proving the existence of the court's subject matter jurisdiction. *Thompson v. McCombe*, 99 F.3d 352, 353 (9th Cir. 1996). A challenge to subject matter jurisdiction may be facial or factual. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). As explained in *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1038 (9th Cir. 2004):

> In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction.

"If the challenge to jurisdiction is a facial attack, i.e., the defendant contends that the allegations of jurisdiction contained in the complaint are insufficient on their face to demonstrate the existence of jurisdiction, the plaintiff is entitled to safeguards similar to those applicable when a Rule 12(b)(6) motion is made." *Cervantez v. Sullivan*, 719 F. Supp. 899, 903 (E.D. Cal. 1989), rev'd on other grounds, 963 F.2d 229 (9th Cir. 1992). "The factual allegations of the complaint are presumed to be true, and the motion is granted only if the plaintiff fails to allege an element necessary for subject matter jurisdiction." *Id.*; *see also Cassirer v. Kingdom of Spain,* 580 F.3d 1048, 1052 n. 2 (9th Cir. 2009), rev'd on other grounds en banc, 616 F.3d 1019 (9th Cir. 2010) (applying *Iqbal*, 556 U.S. 662, to a facial motion to dismiss for lack of subject matter jurisdiction). Here, although the parties do reference documents subject to judicial notice and/or attached to the Complaint, Defendant does not offer any additional evidence in support of its jurisdictional arguments. This is a facial Rule 12(b)(1) attack.

5

2. **Exhaustion Requirement and Waiver Jurisprudence.**

The APA requires that plaintiffs exhaust administrative remedies before bringing suit in federal court. *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 965 (9th Cir. 2006). In the NEPA context, this means that a plaintiff "must structure [its] participation so that it ... alerts the agency [of its] positions and contentions, in order to allow the agency to give the issue[s] meaningful consideration." *Id*. (quoting *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 764–65 (2004)). The purpose of the exhaustion requirement is to avoid premature claims and to ensure the agency is given "a chance to bring its expertise to bear to resolve a claim." *Id*. "[A] claimant need not raise an issue using precise legal formulations, as long as enough clarity is provided that the decision maker understands the issue raised." *Lands Council v. McNair*, 629 F.3d 1070, 1076 (9th Cir. 2010)(internal quotation and citation omitted). Accordingly, "alerting the agency in general terms will be enough if the agency has been given a chance to bring its expertise to bear to resolve the claim." *Id*. If a plaintiff fails to meet exhaustion requirements, its claim is waived. *See Public Citizen*, 541 U.S. at 764–65.

Several district courts, including several within this Circuit and one within this District, have concluded that comments submitted by third parties may form the basis of a NEPA lawsuit, so long as the comments brought sufficient attention to the issue. *See Wyoming Lodging and Restaurants Ass'n v. United States Dep't of Interior*, 398 F. Supp. 2d 1197, 1210 (D. Wyo. 2005) ("[S]o long as the agency is informed of a particular position and has a chance to address that particular position, any party may challenge the action based upon such position whether or not they actually submitted a comment asserting that position."); *Benton County v. United States Dept. of Energy*, 256 F. Supp. 2d 1195, 1198-99 (E.D. Wash. 2003) ("[A] plaintiff, or another, must bring sufficient attention to an issue to stimulate the agency's attention and consideration of the issue during the environmental analysis comment process.")(emphasis added); *Conservation Congress v. United States Forest Service*, 555 F. Supp. 2d 1093, 1106 (E.D. Cal. 2008)(rejecting agency argument that plaintiffs failed to raise an issue at the

administrative level because "[t]here is no need for a litigant to have personally raised the issue, so long as the issue was raised by another party and the agency had the opportunity to consider the objection"); *see also Kern v. Bureau of Land Management*, 38 F. Supp. 2d 1174, 1180 (D. Or. 1999)("There is no need for a litigant to have personally raised the issue, so long as the issue was raised by another party and the agency had the opportunity to consider the objection."), rev'd on other grounds 284 F.3d 1062 (9th Cir.); *see also City of Sausalito v. O'Neill*, 211 F. Supp. 2d 1175, 1198, n. 3 (N.D. Cal. 2002), aff'd in part and rev'd in part on other grounds 386 F.3d 1186 (9th Cir. 2004) (where "all the issues were raised by some participant in the proceedings," this "gave the agency an opportunity to address them in the administrative process prior to litigation).[4]

Here, Plaintiffs point to a comment letter submitted by a coalition of other environmental groups on the "Draft EA/FONSI for the Three Delta Division and Five San Luis Unit Water Service Interim Renewal Contracts 2012-2014." Doc. 34-4.[5] The content of the FAC appears to track the letter almost exactly, and the letter, although it "need not raise an issue using precise legal formulations," certainly provides "enough clarity [to ensure] the decision maker understands the issue raised." *Lands Council*, 629 F.3d at 1076. Defendants do not suggest otherwise.

Federal Defendants' motion to dismiss the FAC for failure to exhaust, which has been joined by Defendant Intervenors, is DENIED.

---

[4] Plaintiffs cite this controlling line of cases concerning exhaustion by third parties in their opposition brief. Federal Defendants entirely fail to address these authorities in reply, focusing instead on the several other arguments Plaintiffs make against waiver. The Court need not address these other grounds, as this one is sufficient to find that Plaintiffs have not waived their claims in this case. Defendant Intervenors mention the third party exhaustion cases in their reply, Doc. 50 at 4, but confuse this line of cases with '*Ilio'ulaokalani Coalition v. Rumsfeld*, 464 F.3d 1083, 1092-93 (9th Cir. 2006), which held that some types of 'procedural" NEPA violations are "so obvious that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action." *Ilio'ulaokalani Coalition* and its "so obvious" holding are simply inapposite here, where a third party clearly and specifically raised the claims in the FAC during the comment period. It is undisputed that the third parties who sent the comment letter filed a lawsuit based upon the issues raised therein, *North Coast Rivers Alliance v. Salazar*, 2:12-cv-00001 MCE GGH, which they later voluntarily dismissed. Defendant Intervenors' suggestion that this "cast[s] doubt" on the merits of this case, *see* Doc. 50 at 3, is irrelevant to the waiver issue.

[5] This letter was appended to the Final EA along with Reclamation's response thereto. The EA and its appendices are public records subject to judicial notice for their existence and content, although not for the truth of the matters asserted therein. *See supra* note 1; *see also Coalition for a Sustainable Delta v. McCamman*, 725 F. Supp. 2d 1162, 1183-84 (E.D. Cal. 2010).

**B.      Motion to Dismiss NEPA Claims.**[6]

1.      **Legal Framework.**

"NEPA is our 'basic national charter for protection of the environment.' " *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.,* 538 F.3d 1172, 1185(9th Cir. 2008) (quoting 40 C.F.R. § 1500.1). "Although NEPA does not impose any substantive requirements on federal agencies, it does impose procedural requirements." *N. Idaho Cmty. Action Network v. U.S. Dept. of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008). "Through these procedural requirements, NEPA seeks to make certain that agencies will have available, and will carefully consider, detailed information concerning significant environmental impacts, and that the relevant information will be made available to the larger public audience. " *Id.* (internal citations and quotations omitted).

NEPA requires federal agencies to analyze the potential environmental impacts of any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Federal Defendants do not here dispute that approval of the Interim Contracts constituted a "major federal action."[7] When an agency takes major federal action, the agency must prepare an EIS "where there are substantial questions about whether a project may cause significant degradation of the human environment." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005). An agency may choose to prepare an environmental assessment ("EA") to determine whether an EIS is needed. 40 C.F.R. §§ 1501.4, 1508.9(b). An EA is meant to be a "concise public document … that serves to," among other things "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9; *see also Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1225 (9th Cir.1988); 40 C.F.R.

---

[6] This aspect of Federal Defendants' motion is subject to Rule 12(b)(6). The relevant standard is discussed above.
[7] Federal regulations implementing NEPA define the term "major federal action" to "include[] actions with effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18. "Actions include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals…." § 1508.18(a).

1   1501.4(e).

2

3   **2.    The NEPA Claims in this Case.**

4       The FAC contains two separate NEPA claims. The first alleges Federal Defendants violated

5   NEPA by preparing an inadequate EA. Specifically, Plaintiffs allege that the EA and FONSI were

6   unlawful because:

7           (1) "The EA fails to identify and analyze the interim contracts' principal environmental

8           impacts because it assumes incorrectly that Reclamation's continued delivery of water in

9           the same quantities is the baseline or background against which to measure the interim

10          contracts' impacts." FAC ¶ 33a.

11          (2) The EA fails to consider a reasonable range of alternatives, having considered only

12          the Proposed Action and the No Action Alternative, which are effectively the same with

13          one small pricing difference. Alternatives proposing reduced "quantities of water

14          deliveries" and/or "alternatives that increased prices and thereby reduced the interim

15          contractors' demand for CVP water" were eliminated from consideration. FAC ¶ 33b; *see*

16          *also* FAC ¶ 31 (the EA and FONSI are based "on the false premise that in renewing the

17          interim contracts it had no discretion to reduce or eliminate water deliveries").

18          (3) The EA uses an "unduly narrow" study area, thereby ignoring the environmental

19          impacts of the interim contracts' water deliveries on the source watersheds, imperiled fish

20          and wildlife living there, water quality and fish species in San Joaquin Valley

21          watercourses, and on the Delta. FAC ¶ 33c.

22          (4) The EA failed to consider the effect of water deliveries on Reclamation's compliance

23          with other environmental laws, such as the ESA, the Clean Water Act, 33 U.S.C. § 1251

24          et seq., and the Migratory Bird Treaty Act, 16 U.S.C. § 703 et seq. FAC ¶ 33d.

25          (5) The EA ignores the cumulative impacts of all the interim contract renewals. FAC ¶

26

27

28

33e.

The Second Claim for Relief alleges generally that approval of each of the Interim Contracts "is a major federal action that may significantly affect the quality of the human environment" requiring preparation of an EIS, which indisputably has not occurred. FAC ¶¶ 35-37.

### 3.   **The No Action Alternative.**[8]

Federal Defendants directly challenge Plaintiffs' allegation that the EA utilized an improper "no action" alternative. Doc. 45 at 10-12. Among the alternatives required to be discussed in every EA or EIS is the "no action" alternative. 40 C.F.R. § 1502.14.[9] "A no action alternative in an [EA or] EIS allows policymakers and the public to compare the environmental consequences of the status quo to the consequences of the proposed action." *Ctr. for Biological Diversity v. U.S. Dept. of Interior*, 623 F.3d 633, 642 (9th Cir. 2010). "The no action alternative is meant to provide a baseline against which the action alternative" may be compared. *Id.* (internal citation and quotation omitted).

The EA in this case defines the "No Action Alternative" as follows:

> The No Action Alternative is the continued delivery of CVP water under the interim renewal of existing contracts which includes terms and conditions required by non-discretionary CVPIA provisions. The No Action Alternative, therefore, consists of the interim renewal of current water service contracts that were considered as part of the Preferred Alternative of the CVPIA PEIS (Reclamation 1999a) adapted to apply for an interim period.
>
> The CVPIA PEIS Preferred Alternative assumed that most contract provisions would be similar to many of the provisions in the 1997 CVP interim renewal contracts, which included contract terms and conditions consistent with applicable CVPIA requirements. In addition, provisions in the existing long term contracts that are specific to the San Luis Unit contracts regarding O&M of certain facilities and drainage service under the 1960 San Luis Act would be incorporated into the No Action Alternative without substantial

---

[8] The Parties disagree as to the scope of Federal Defendants' motion to dismiss. Doc. 49 at 6 n. 5. Federal Defendants maintain it is an attack upon the entire complaint. Id. Plaintiffs assert it fails to address all of the claims in the FAC. Doc. 48 at 15. Federal Defendants' motion does open with a general argument that "under the facts alleged in the Complaint, Plaintiffs have failed to state any NEPA claim." Doc. 45 at 10. However, the motion only directly challenges certain aspects of Plaintiffs' allegations. To the extent Defendants' arguments impliedly challenge and/or render legally untenable other aspects of the complaint, such implications will be discussed.

[9] Although this regulatory provision facially applies only to EISs, "[t]he alternatives provision of NEPA applies whether an agency is preparing an EIS or an EA." *Native Ecosystems*, 428 F.3d at 1245.

change.

Section 3405(d) of the CVPIA requires tiered pricing to be included in contracts greater than three years in duration. Consequently, if at least 80 percent of the contract total is delivered in any year for contracts greater than three years, in such year incremental charges based on the 80/10/10 pricing structure would be collected and paid to the Restoration Fund.

[Subheading omitted] Several applicable CVPIA provisions which were incorporated into the Preferred Alternative of the Final PEIS and which are included in the No Action Alternative include tiered water pricing, defining M&I water users, requiring water measurement, and requiring water conservation. These provisions were also summarized in EA-07-56 (Reclamation 2007) and are incorporated by reference.

In addition, the No Action Alternative includes environmental commitments as described in the Biological Opinion for the CVPIA PEIS (Reclamation 2000c).

Doc. 4-1, EA at 12 (emphasis added). The "Proposed Action" is defined in the EA as follows:

The Proposed Action evaluated in this document is the execution of eight interim renewal water service contracts between the United States and the contractors listed in Table 2-1. These are the same eight contracts included under the No Action Alternative. WWD's main contract (14-06-200-495A-IR2) is currently on its second interim renewal contract. The Proposed Action would be their third. The remaining seven interim renewal contracts listed in Table 2-1 are currently on their twelfth interim renewal contract. The Proposed Action would be their thirteenth.....

The Proposed Action would continue these existing interim renewal contracts, with only minor, administrative changes to the contract provisions to update the previous interim renewal contracts for the new contract period. In the event that a new long-term water contract is executed, that interim renewal contract would then expire.

No changes to the contractors' service areas or water deliveries are part of the Proposed Action. CVP water deliveries under the eight proposed interim renewal contracts can only be used within each designated contract service area (see Appendix A for service area maps). The contract service area for the proposed interim renewal contracts have not changed from the existing interim renewal contracts. The proposed interim renewal contract quantities (Table 2-1) remain the same as in the existing interim renewal contracts. Water can be delivered under the interim renewal contracts in quantities up to the contract total, although it is likely that deliveries will be less than the contract total. The terms and conditions of the 2010 interim renewal contracts analyzed within EA-09-101 and EA-09-126 (Reclamation 2010a and 2010b) are incorporated by reference into the Proposed Action.

The eight interim water service contracts contain provisions that allow for adjustments resulting from court decisions, new laws, and from changes in regulatory requirements imposed through re-consultations. Accordingly, to the extent that additional restrictions are imposed on CVP operations to protect threatened or endangered species, those

11

restrictions would be implemented in the administration of the eight interim water service contracts considered in this EA. As a result, by their express terms the interim renewal contracts analyzed herein would conform to any applicable requirements lawfully imposed under the federal ESA or other applicable environmental laws.

*Id*. (emphasis added).

The FAC alleges, and Defendants do not appear to dispute, that the No Action Alternative defines the baseline as "continued delivery of water in the same quantities….," FAC ¶ 33a, and that the "No Action Alternative … is the same project as the Proposed Action, with only one small pricing difference," FAC ¶ 33b (emphasis in original). The FAC further alleges that the No Action Alternative unlawfully "failed to consider non-renewal of the contracts." FAC ¶ 33b (emphasis added).

Federal Defendants make several arguments in support of their contention that the No Action Alternative was appropriate as a matter of law. First, Federal Defendants argue that it is appropriate to define a no action alternative as "no change" from current management intensity. There is considerable support for this proposition. Although the term "no action" alternative is not defined in the statute or NEPA regulations, in 1981, the Council on Environmental Quality ("CEQ"), the agency charged with designing NEPA's implementing regulations, *see* 40 C.F.R. § 1500.3, issued an informatory "Memorandum to Agencies Containing Answers to 40 Most Asked Questions on NEPA Regulations." 46 Fed. Reg. 18,026-01 (March 23, 1981) ("40 Questions Memorandum"). The third question the Memorandum addresses is: "What does the 'no action' alternative include? If an agency is under a court order or legislative command to act, must the EIS address the 'no action' alternative?" *Id*. at 18,027. The CEQ's answer provides in pertinent part:

[] Section 1502.14(d) requires the alternatives analysis in the EIS to "include the alternative of no action." There are two distinct interpretations of "no action" that must be considered, depending on the nature of the proposal being evaluated. The first situation might involve an action such as updating a land management plan where ongoing programs initiated under existing legislation and regulations will continue, even as new plans are developed. In these cases "no action" is "no change" from current management direction or level of management intensity. To construct an alternative that is based on no management at all would be a useless academic exercise. Therefore, the "no action" alternative may be thought of in terms of continuing with the present course

<u>of action until that action is changed</u>. Consequently, projected impacts of alternative management schemes would be compared in the EIS to those impacts projected for the existing plan. In this case, alternatives would include management plans of both greater and lesser intensity, especially greater and lesser levels of resource development.

The second interpretation of "no action" is illustrated in instances involving federal decisions on proposals for projects. "No action" in such cases would mean the proposed activity would not take place, and the resulting environmental effects from taking no action would be compared with the effects of permitting the proposed activity or an alternative activity to go forward.

***

In light of the above, it is difficult to think of a situation where it would not be appropriate to address a "no action" alternative. Accordingly, the regulations require the analysis of the no action alternative even if the agency is under a court order or legislative command to act. This analysis provides a benchmark, enabling decisionmakers to compare the magnitude of environmental effects of the action alternatives. It is also an example of a reasonable alternative outside the jurisdiction of the agency which must be analyzed. Section 1502.14(c). [] Inclusion of such an analysis in the EIS is necessary to inform the Congress, the public, and the President as intended by NEPA. Section 1500.1(a).

*Id* (emphasis added).

Numerous cases have applied these instructions to "allow the status quo… to be the no action alternative." *Ass'n of Public Agency Customers, Inc. v. Bonneville Power Administration,* 126 F.3d 1158, 1188 (9th Cir. 1997). *Association of Public Agency Customers* concerned an EIS evaluating renewal by the federal Bonneville Power Administration of certain types of power supply contracts. *Id*. at 1165-70. The Ninth Circuit rejected the argument that the "no action" alternative should reflect non-renewal of those contracts, citing the 40 Questions Memorandum for the proposition that "[t]he 'no action' alternative may be thought of in terms of continuing with the present course of action until that action is changed." *Id*. at 1188; *see also Westlands Water Dist. v. United States Dept. of Interior,* 376 F.3d 853, 869 (9th Cir. 2004) (noting that the no action alternative in the EIS for the Trinity River Flow Evaluation Study, a program designed "restor[e] and protect[] the fish and wildlife habitats of the Central Valley and Trinity River Basins," was properly defined as the 340,000 AF/year minimum flow level prescribed by CVPIA § 3406(b)(23)").

13

Likewise, *American Rivers v. Federal Energy Regulatory Commission*, 201 F.3d 1186, 1200-01 (9th Cir. 2000), found a "status quo" no action alternative lawful under NEPA in the context of a federal hydropower relicensing proceeding. Plaintiffs attempt to distinguish *American Rivers* because of the unique legal framework imposed by the Federal Power Act ("FPA") upon hydropower relicensing. Specifically, if the Federal Energy Regulatory Commission ("FERC") failed to take action on a relicensing application, the FPA requires FERC to permit the applicant "to continue operating the project indefinitely subject to the terms and conditions of its expired original license." *Id*. at 1200. This is a clear statutory command to maintain the status quo in the absence of re-licensing, directly controlling the form of the no action alternative.

In an attempt to set up a contrast, Plaintiffs maintain that Reclamation was <u>not</u> required to enter in the Interim Contracts. This argument is based upon the text of CVPIA § 3404(c)(1), which provides in pertinent part:

> (c) Renewal of Existing Long-Term Contracts.--Notwithstanding the provisions of the Act of July 2, 1956 (70 Stat. 483), <u>the Secretary **shall,** upon request, renew any existing long-term repayment or water service contract for the delivery of water from the Central Valley Project for a period of 25 years and may renew such contracts for successive periods of up to 25 years each</u>.

> > (1) No such renewals shall be authorized until appropriate environmental review, including the preparation of the environmental impact statement required in section 3409 of this title, has been completed. <u>Contracts which expire prior to the completion of the environmental impact statement required by section 3409 **may** be renewed for an interim period not to exceed three years in length, and for successive interim periods of not more than two years in length, until the environmental impact statement required by section 3409 has been finally completed, at which time such interim renewal contracts shall be eligible for long-term renewal as provided above</u>. Such interim renewal contracts shall be modified to comply with existing law, including provisions of this title….

(Emphasis added.) Plaintiffs concede that the use of the term "shall" in reference to the renewal of long-term contracts means that Reclamation lacks discretion to <u>dis</u>approve requested long-term renewals, provided "appropriate environmental review, including the preparation of the environmental impact

14

statement required by [CVPIA § 3409] has been completed."[10] Doc. 48 at 2. However, Plaintiffs

maintain that Reclamation retains full discretion to disapprove or alter the Interim Contracts, because

CVPIA § 3404(c)(1) indicates they "***may*** be renewed for an interim period." *Id*. Normally when both

"shall" and "may" are used in a statute, the "inference is that each is being used in its ordinary sense –

the one being permissive, the other mandatory." *Ctr. for Biological Diversity v. United States Fish and

Wildlife Serv.*, 450 F.3d 930, 935 (9th Cir. 2006) (internal citations and quotations omitted). Here,

however, Plaintiffs' interpretation cannot be countenanced with the obvious (and conceded)

Congressional intent that the contractual relationship between Reclamation and water users is not to be

interrupted. Rather, the Court is persuaded by Federal Defendants' suggested interpretation of this

statutory language, namely, that Congress used the term "may" in reference to interim contracts because

re-using the term "shall" would lead to the absurd result that Reclamation would be required to keep

issuing interim contracts even when long-term ones were in place. Here, the "may" is permissive only

insofar as it permits Reclamation to use interim contracts as an alternative to mandatory long-term

contracts.[11]

Accordingly, *American Rivers* is at least partially analogous. In *American Rivers* the FPA

required perpetuation of pre-existing license terms as the status quo pending action on a new license.

Here, because the CVPIA requires renewal of at least <u>some</u> form of interim contract, albeit not

necessarily on exactly the same terms as a previous contract, this effectively renders a "no contract"

alternative inappropriate, even as the "no action" alternative.[12]

---

[10] There appears to be no dispute that the EIS specifically called for in CVPIA § 3409, the CVPIA PEIS, was completed in 1999. Whether other requisite "appropriate environmental review" is required and/or has been completed remains in dispute, an issue that need not be resolved to determine the appropriate "no action" alternative in this case.

[11] The Parties have not addressed, nor does the Court, the far more complicated question of whether, to what extent, and under what circumstances Reclamation has discretion to <u>modify</u> either interim or long-term contracts upon renewal.

[12] The 40 Questions Memorandum does indicate that the relevant NEPA "regulations require the analysis of the no action alternative even if the agency is under a court order or legislative command to act," 46 Fed. Reg. at 18,027. Plaintiffs suggest that this language requires inclusion of a "no contract" alternative even when the contract renewal is required. Doc. 48 at 13. Although this interpretation of the Memorandum is facially logical, it cannot be squared with binding Ninth Circuit caselaw permitting the "no action" alternative to represent the pre-existing status quo, even in the context of contract renewals.

Even if, arguendo, *American Rivers* is distinguishable on the ground suggested by Plaintiffs, other cases confirm that it is appropriate for a no action alternative to reflect "historical uses" of a resource. For example, in *Natural Res. Def. Council, Inc. v. Hodel*, 624 F. Supp. 1045, 1054-55 (D. Nev. 1985), a decision affirmed by the Ninth Circuit in an opinion that adopted the district court's reasoning, 819 F.2d 927 (9th Cir. 1987), the Bureau of Land Management ("BLM") prepared an EIS concerning various aspects of its grazing management activities in and around the Reno, Nevada area. *Id*. at 1048-49. The plaintiffs argued that BLM should have included a "no grazing" alternative. *Id*. at 1054. This argument was rejected in part because it was "an indisputable fact that livestock grazing has been going on in the Reno planning area, on public lands, for more than a century." *Id*. In addition, the mandate of Congress in relevant statutes "was that livestock use was to continue as an important use of public lands" and that such use "should be managed to maximize productivity for livestock and other specified uses." *Id*. (citing 43 U.S.C. § 1903). "NEPA does not require examination of alternatives that are so speculative, contrary to law, or economically catastrophic as to be beyond the realm of feasibility." *Id*. (citing *Kilroy v. Ruckelshaus*, 738 F.2d 1448, 1454 (9th Cir. 1985); *California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982)).

> The complete abandonment of grazing in the Reno planning area is practically unthinkable as a policy choice; it would involve monetary losses to the ranching community alone of nearly 4 million dollars and 290 jobs. Of course, compared with the economy of the Reno area as a whole, ranching plays only a negligible role. Nevertheless, eliminating all grazing would have extreme impacts on this small community. A "no grazing" policy is simply not a "reasonable alternative" for this particular area.

*Id*. Finally, the district court found that a "no grazing" alternative was not required by CEQ's "no action" alternative regulation, 40 C.F.R. § 1502.14(d). *Id*. "The 'no action' alternative studied in the EIS is the correct 'no action' alternative, as contemplated by the CEQ regulations, namely continuation of the status quo ante, in the absence of any of the proposed actions." *Id*. "No action" was "certainly not, in this context, a complete reversal or abolition of a historical pattern of use over 100 years old." *Id*.; *see also Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Engineers*, 817 F. Supp. 2d 1290, 1312-13 (D. Or. 2011)

(rejecting argument that "true" no action alternative for EIS evaluating agency's proposal to create a streamlined permitting process for gravel mining in the Chetco River must reflect no mining at all; it was undisputed that mining occurred regularly since the 1900s and NEPA permits the no-action alternative to reflect the "context of the historical uses of the action area").

Here, the historical use of CVP water by the Interim Contractors pursuant to previous long-term contracts is an indisputable matter of public record. *See* FAC at p. 12 (acknowledging that in 2005 the Bureau was in the process of renewing long-term contracts previously held by the interim contractors); *cf. Natural Resources Defense Council v. Salazar*, 686 F.3d 1092, 1095 (9th Cir. 2012) (discussing historical use by Delta-Mendota Canal Contractors). This provides additional support for Federal Defendants' use of a "status quo" no action alternative.

It is important to understand how the authorities cited above approving of the use of a "status quo" no action alternative relate to a separate line of cases cited by Federal Defendants which stand for the proposition that no EIS is required where a project maintains the status quo. "Discretionary agency action that does not alter the status quo does not require an EIS." *Nat'l Wildlife Fed'n v. Espy,* 45 F.3d 1337, 1344 (9th Cir.1995). "In other words, an EIS is not required in order to leave nature alone." *Kootenai Tribe of Idaho v. Veneman,* 313 F.3d 1094, 1114 (9th Cir. 2002), abrogated on other grounds by *Wilderness Soc. v. U.S. Forest Serv*., 630 F.3d 1173 (9th Cir. 2011) (internal quotation marks and citation omitted).

For example, in *Espy*, a federal agency took title to a ranch from a delinquent borrower and subsequently sold the property to a third party. 45 F.3d 1337. Because the new owners continued a longstanding practice of grazing cattle on wetlands located at the ranch, the Ninth Circuit held that the title transfer was not subject to NEPA because the status quo was not altered. *Id.* at 1343-44. *Compare Burbank Anti–Noise Group v. Goldschmidt*, 623 F.2d 115, 116–17 (9th Cir. 1981) (NEPA does not apply when an agency financed the purchase of an airport already built); *Bicycle Trails Council of Marin*

1   *v. Babbitt*, 82 F.3d 1445, 1446 (9th Cir. 1996) (closure of bicycle trails does not trigger EIS), *with*

2   *Kootenai Tribe* 313 F.3d at 1114 (transition to less active management of national forests that would

3   result from agency rule constituted a change in the status quo because "human intervention, in the form

4   of forest management, has been part of the fabric of our national forests for so long…").

5          Together, these two lines of cases establish that: (1) the "status quo" is an appropriate no-action

6   alternative; and (2) where the project does not operate to alter the status quo, no EIS is required.

7   Emerging from within this second line of cases is the only factually analogous case that even arguably

8   supports Plaintiffs' position regarding the no action alternative. In *Pit River Tribe v. United States*

9   *Forest Serv.*, 469 F.3d 768 (9th Cir. 2006), the Ninth Circuit examined whether re-extension of leases

10  permitting production of geothermal energy constituted preservation of the status quo. The Ninth Circuit

11  emphasized that the status quo before any extension was that the lessee owned rights to produce

12  geothermal steam valid through the end of the lease period, after which it "owned nothing." *Id*. at 784.

13  This was distinguishable from the "continued use" scenario presented in *Espy* because without

14  "affirmative re-extension" of the lease, the lessee "would have retained no rights at all to the leased

15  property and would not have been able to go forward with [a project]." *Id*. "Instead of preserving the

16  status quo, the lease extensions gave [the lessee] an extra five years to develop the land and the

17  possibility of obtaining a future lease extension of up to forty years." *Id*. Critically, both the original

18  lease and the extension "did not reserve to the agencies the absolute right to deny development" so "did

19  not merely preserve the status quo" of undeveloped land. *Id*. Accordingly, "the agencies were required

20  to complete an environmental impact statement before extending the leases." *Id*.

21         Although *Pitt River* does not specifically address the nature of any "no action" alternative, the

22  reasoning certainly suggests that it would not have been appropriate for the no action alternative in that

23  case to define the "status quo" to include the existence of the lease terms (i.e. the right to develop the

24  energy resource). *See also Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1026-27 (9th Cir.

18

2008) (finding a NEPA violation where the "no-action" alternative assumed the existence of the very

plan being proposed); *North Carolina Wildlife Fed'n v. North Carolina Dept. of Transp.*, 677 F.3d 596,

603 (4th Cir. 2012) ("courts not infrequently find NEPA violations when an agency miscalculates the

"no build' baseline or where the baseline assumes the existence of the proposed project").

But, defining the baseline to be the status quo, which is clearly permissible under Ninth Circuit

authority, is not the same thing as assuming the baseline includes aspects of the proposed project, which

is not permissible. For example, in *Pitt River*, because there was no history of energy development at the

site, the status quo was a site without energy development. In contrast, in *Association of Public Agency*

*Customers*, it was appropriate for the "no action" alternative to reflect the renewal of energy contracts,

which represented "continuing with the present course of action…." 126 F.3d at 1188. In *American*

*Rivers*, a "status quo" no action alternative appropriately assumed "continue[d] operat[ion] [of] the

project [] subject to the terms and conditions of [the] expired original license" because the governing

statute required as much. 201 F.3d at 1200. Likewise, in *NRDC v. Hodel*, 624 F. Supp. at 1054-55, the

no-action alternative correctly assumed continuation of historical grazing practices, particularly in light

of the fact that governing statutes indicated Congress' intent that livestock use was to continue on public

lands.

Here, assuming the truth of the facts alleged in the FAC, the Bureau appropriately defined the

status quo as the "continued delivery of CVP water under the interim renewal of existing contracts

which includes terms and conditions required by non-discretionary CVPIA provisions." Doc. 4-1, EA at

12. As in *Association of Public Energy Customers*, the Bureau appropriately assumed continuation of

the present course of action. The indisputable historical pattern of use of the resource (water) further

supports the Bureau's definition of the no-action alternative in this case.

Federal Defendants' motion to dismiss Plaintiff's NEPA claim that the "no action" alternative

was unlawful is GRANTED WITHOUT LEAVE TO AMEND, as Plaintiffs have not requested leave to

1   amend and amendment could not possibly cure the defect.

2

3   **4.     Federal Defendants' Argument that the Project Does Not Alter the Status Quo.**

4          As discussed above, Federal Defendants rely on a line of cases which stand for the proposition

5   that no EIS is required for a project that does not alter the status quo. Federal Defendants argue it is

6   "undisputed" that the Proposed Action does not alter the status quo in this case and, therefore, that the

7   issuance of a FONSI was appropriate. The FAC in fact alleges that the "No Action Alternative … is the

8   same project as the Proposed Action with only one small pricing difference." FAC at ¶ 33b. The FAC

9   does not allege that this "small pricing difference" will have any material effect on the environment.[13]

10  Nor does Plaintiff contest Federal Defendants' assertion that, if the no action alternative was correctly

11  formulated, the Proposed Action would not alter the status quo. This renders Plaintiffs' Second Claim

12  for Relief, which alleges Reclamation unlawfully failed to prepare an EIS, ineffective as a matter of law.

13  The caselaw discussed above clearly establishes that where the Proposed Action does not alter the status

14  quo, no EIS is required. Federal Defendants' motion to dismiss the Second Claim for Relief is

15  GRANTED WITHOUT LEAVE TO AMEND, as amendment on this issue would be futile.

16

17

18  **5.     Other Challenges to the Content of the EA.**

19         The above conclusion does not automatically obviate the remainder of Plaintiffs' claims

20  regarding the content of the EA. Under some, unique circumstances, a finding that no EIS is required

21  would automatically obviate the need for any EA. *See Douglas County v. Babbitt*, 48 F.3d 1495, 1505

22  (9th Cir. 1995) (given that preparation of an EIS is never required for a designation of critical habitat

23  under the ESA, because Congress intended for ESA critical habitat procedures to replace NEPA

24  requirements, the agency's failure to prepare an EA did not violate NEPA). However, although

25  preparation of an EA is arguably "optional" under NEPA, *Grand Canyon Trust v. U.S. Bureau of*

26

27

28  ---
    [13] The FAC does allege that Reclamation failed to consider alternatives that included different pricing structures designed "to reduce water demand and thus reduce exports and their environmental impacts." FAC ¶ 2; *see also* FAC ¶ 33b.

*Reclamation,* 691 F.3d 1008, 1013 (9th Cir. 2012) ("An agency undertaking a major federal action may first prepare an [EA] to determine whether an EIS is necessary."), an agency that chooses to prepare an EA gains the benefit of a more relaxed standard of review of any decision not to prepare an EIS, *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 640 (9th Cir. 2004) ("Typically, an agency's decision not to prepare an EIS is reviewed under the arbitrary and capricious standard; however, where an agency has decided that a project does not require an EIS without first conducting an EA, we review under the reasonableness standard.").

In addition, NEPA contains separate, specific requirements regarding the content of an EA:

> Environmental Assessment:
>
> (a) Means a concise public document for which a Federal agency is responsible that serves to:
>
> > (1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.
> >
> > (2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.
> >
> > (3) Facilitate preparation of a statement when one is necessary.
>
> (b) Shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

40 C.F.R. § 1508.9. An EA that is followed by a FONSI must provide sufficient information and detail to demonstrate that the agency took the required "hard look" at the environmental consequences of the project before concluding that those impacts were insignificant. *Save the Yaak Comm. v. Block*, 840 F.2d 714, 717 (9th Cir. 1988) ("[A]n agency's decision not to prepare an EIS will be considered unreasonable if the agency fails to supply a convincing statement of reasons why potential effects are insignificant."). To be adequate, an EA, like an EIS, must analyze cumulative impacts and respond to public comments concerning the project. *Native Ecosystems*, 304 F.3d at 893, 896; *Found. for North Am. Wild Sheep v. U.S. Dept. of Agr.*, 681 F.2d 1172, 1178 (9th Cir. 1982). Furthermore, the conclusions in the EA must be

supported by "some quantified or detailed information," and the underlying environmental data relied upon to support the expert conclusions must be made available to the public. *Klamath–Siskiyou Wildlands v. Bureau of Land Mgmt.,* 387 F.3d 989, 993, 996 (9th Cir. 2004).

These requirements suggest that once an agency elects to prepare an EA, the EA is subject to independent review, even if it has already been determined that no EIS is required. *See Natural Res. Def. Council, Inc. v. U.S. Forest Serv*., 634 F. Supp. 2d 1045, 1059-60 (E.D. Cal. 2007) (requiring consideration of alternatives, albeit a more limited number, in an EA, even where EIS is not required); *Sabine River Auth. v. U.S. Dept. of Interior*, 745 F. Supp. 388, 394 (E.D. Tex. 1990), aff'd, 951 F.2d 669 (5th Cir. 1992) (independently analyzing challenges to the content of an EA after rejecting challenge to agency's failure to prepare EIS on the ground that the project did not alter the status quo). Federal Defendants do not point to any authority suggesting otherwise.

### a. <u>Reasonable Range of Alternatives.</u>

Plaintiffs independently allege that the EA fails to consider a reasonable range of alternatives, including alternatives that would "reduce[] [the] quantity of water deliveries" and/or alter the pricing structure to "reduce the interim contractors' demand for CVP water." FAC ¶ 33b; *see also* FAC ¶ 2. Generally, "NEPA requires the agencies to 'study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources.' " *N. Idaho Cmty. Action Network*, 545 F.3d at 1153 (quoting 42 U.S.C. § 4332(2)(E)). "This alternatives provision applies whether an agency is preparing an [EIS] or an [EA], and requires the agency to give full and meaningful consideration to all reasonable alternatives." *Id*. (citing *Native Ecosystems,* 428 F.3d at 1245). However, "an agency's obligation to consider alternatives under an EA is a lesser one than under an EIS." *Id*. "[W]hereas with an EIS, an agency is required to '[r]igorously explore and objectively evaluate all reasonable alternatives,' with an EA, an agency only is required to include a brief discussion of reasonable alternatives." *Id* (comparing 40

C.F.R. § 1502.14(a), with § 1508.9(b)); *see also Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dept. of Interior*, 608 F.3d 592, 602 (9th Cir. 2010).

The purpose and need of a project determines the range of alternatives that an agency must consider. *N.W. Envt'l Defense Center v. Bonneville Power Admin.,* 117 F.3d 1520, 1538 (9th Cir. 1997). "Where the expected impacts of a project are narrower, such that an EIS is not required, the agency may consider a smaller number of alternatives." *Natural Res. Def. Council, Inc. v. U.S. Forest Serv*., 634 F. Supp. 2d at 1059-60 (citing *Native Ecosystems,* 428 F.3d at 1246). In *Native Ecosystems,* for example, an EA that only considered in detail two alternatives -- a "no-action" alternative and the "preferred alternative" -- fully satisfied NEPA. 428 F.3d at 1245-46.

Here, the EA "considered" but "eliminated" two alternatives other than the No Action and Proposed Action alternatives, namely "non-renewal of [the] contracts" and "reduction in interim renewal contract water quantities." Doc. 4-1, EA at 13-14. Federal Defendants' motion to dismiss does not discuss the reasons why these alternatives were "eliminated," nor whether the remaining two alternatives constitute a "reasonable range." Federal Defendants cite no authority to support a conclusion that the fact that an EIS is not required obviates as a matter of law the need for the Bureau to consider a reasonable range of alternatives in its EA. The Court will not manufacture arguments for either party. Apart from the finding that the "no action" alternative was lawfully framed, this order does not address Plaintiffs' claims regarding the EA's other alternatives.

       **b.**    <u>**Failure to Consider Environmental Impacts Beyond Application Area.**</u>

Federal Defendants do directly challenge Plaintiffs' contention that the EA must evaluate the environmental impacts of the Interim Contracts on the source watersheds, on water quality and fish species in the San Joaquin Valley, and on the Delta itself. *Id.* The EA restricts its "Study Area" solely to the service areas of the Interim Contractors. FAC ¶ 33c; *see generally* Doc. 4-1, EA. Although the argument is not well focused, it appears that Federal Defendants maintain that the EA did not need to

23

1    evaluate impacts beyond the application area because such impacts are covered by other environmental

2    documents.

3        In support of this proposition, Federal Defendants cite a 2008 ruling in *Natural Resources*

4    *Defense Council v. Kempthorne*, 1:05-cv-1207 OWW TAG, 2008 WL 5054115 (E.D. Cal. 2008),[14]

5    which concerned Reclamation's execution of 41 long-term CVP contracts. Environmental plaintiffs in

6    *Kempthorne* argued that Reclamation violated the ESA by failing to ensure that its actions with respect

7    to contracting for water deliveries would not jeopardize the continued existence of the threatened Delta

8    smelt nor adversely modify its critical habitat. *Id.* at *2. The district court found that Plaintiffs lacked

9    standing to sue as to certain long-term contracts belonging to certain south-of-Delta water service

10   contractors because those contracts contained a "pass-through" shortage provision which specifically

11   absolves the Bureau from any liability for non-delivery of water and/or any other actions required to

12   comply with the ESA and other Federal and State laws. *Id.* at *15. As a result of this shortage language,

13   the district court found that the contracts in question could not cause any additional harm to the smelt,

14   above and beyond that which might be caused by operation of the CVP. *See id.* at *17. Critically,

15   because the Bureau chose to evaluate impacts to and/or protections required for the smelt in another

16   document (the "OCAP BiOp"), plaintiffs could not establish a causal connection between execution and

17   performance of these contracts and harm to the smelt. *Id.*[15]

18       Here, Federal Defendants seek to extend this holding to absolve the Bureau of the need to

19   comply with NEPA in this case. Federal Defendants argue that although execution of these Interim

20   Contracts is "necessary … to provide for continued repayment of certain construction and operating

21   costs associated with the CVP, they are not the documents (and their execution is not the agency action)

22   that deals with CVP operations (including water deliveries to CVP contractors) or the potential

---

[14] Although this decision was affirmed sub nomine, 686 F.3d 1092 (9th Cir. 2012), rehearing en banc was granted on March 5, 2013, --- F.3d ---, 2013 WL 794343.

[15] It is worth noting that this standing impediment did not exist with respect to other types of CVP contracts that did not contain complete "pass-through" shortage provisions. *Id.* at *19-*20.

environmental effects of such operations." Doc. 45 at 11. Rather, "[t]hose potential operational effects are addressed by the Bureau through other actions and processes." *Id*.

It is true that NEPA permits tiered environmental review. 40 C.F.R. § 1502.20 ("Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review."). The term "tiering" refers to "the coverage of general matters in broader environmental impact statements (such as national program or policy statements)" followed by "narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared." 40 C.F.R. § 1508.28.

Federal Defendants correctly point out that impacts of CVP operations on species listed as threatened and endangered under the ESA are being evaluated in other contexts. *See Consolidated Delta Smelt Cases*, 2013 WL 394025, *1 (E.D. Cal. Jan. 30, 2013) (summarizing remand schedules in that case and the Consolidated Delta Smelt Cases). Federal Defendants are also correct that NEPA analyses are being prepared in connection with these cases. *See id*. However, the NEPA analysis associated with these ESA cases is not yet complete. *Id*. (indicating remand, including completion of NEPA analysis, will not be complete until December 1, 2013 according to current schedule in the Consolidated Delta Smelt Cases and April 29, 2016 in the Consolidated Salmonid Cases). Federal Defendants fail to explain how an EA can tier off of a non-existent EIS. Moreover, the scope of the NEPA analyses required by court order in connection with the OCAP BiOps is limited to the environmental impacts of specific actions planned to be taken to protect endangered species (including actions that will curtail water deliveries), not the full scope of environmental impacts of the water deliveries themselves. *See generally Consolidated Delta Smelt* Cases, 686 F. Supp. 2d 1026 (E. D. Cal. 2009); Consolidated *Salmonid Cases*, 688 F. Supp. 2d 1013 (E.D. Cal. 2010).

As discussed above, the Bureau has already prepared a programmatic EIS for implementation of the CVPIA in 1999. FAC at p. 12. However, while the CVPIA PEIS may have evaluated the environmental impacts of water deliveries across the entire CVP system, the existing record does not establish that the CVPIA PEIS completely satisfies NEPA with respect to the requisite analysis of such impacts. According to the allegations in the FAC, the Bureau believed additional site-specific NEPA review was necessary when it proposed to renew long-term contracts for the West San Joaquin Division and San Luis Contractors. FAC at p. 12. Why, then, would <u>interim</u> contract renewal <u>not</u> require such site-specific review? Perhaps there is a basis for such a distinction, but no such explanation is offered in the current record. Federal Defendants' motion to dismiss Plaintiff's claim that the EA improperly limited its scope is DENIED WITHOUT PREJUDICE to this argument being raised on a more complete record.

> c.    **Remaining Allegations.**

Likewise, Federal Defendants' motion does not directly address Plaintiffs' allegations that the EA was based on outdated water needs assessment, that the EA failed to consider the effects of water diversions on certain other environmental laws, and that the EA failed to address the cumulative impacts of the contracts.

As to the water needs assessment allegation, Plaintiffs allege that the EA unlawfully relied upon a 2006 water needs assessment. FAC ¶ 32. According to the FAC "[s]ince 2006, the contractors' water needs have changed significantly, based in part on retirement of farmland plagued by drainage and groundwater contamination problems." *Id*. As a result, "Reclamation's analysis of purpose and need violates NEPA." *Id*. Federal Defendants cite no authority, and the Court has been unable to locate any, that supports automatic dismissal of such a claims based upon the conclusions reached elsewhere in this Order. This Order, therefore, does not address this claim.

As to the effect of diverting and delivering water pursuant to the contracts on Reclamation's compliance with other environmental laws, NEPA requires an EIS to "state how alternatives considered in it and decisions based on it will or will not achieve the requirements of … other environmental laws and policies." 40 C.F.R. § 1502.2(d). It is not clear to what extent this is required in an EA, because the pleadings do not discuss this allegation. To the extent Federal Defendants impliedly assert that this obligation is satisfied because the EA tiers off of other documents, any such argument has been rejected above, at least on the present record.

As to the cumulative impact analysis claim, it is well established that NEPA "requires that an environmental analysis for a single project consider the cumulative impacts of that project together with 'past, present and reasonably foreseeable future actions.' " *Native Ecosystems Council v. Dombeck,* 304 F.3d 886, 894 (9th Cir. 2002) (quoting 40 C.F.R. § 1508.7). It is particularly important that EAs consider the "additive effect of many incremental environmental encroachments" because "so many more EAs are prepared than EISs…." *Id.* at 896 (internal citations and quotations omitted). Again, the Court has been unable to locate authority to support dismissal of this claim based upon conclusions reached elsewhere in this Order.

**6.**  **Defendant Intervenors' Challenge to Claims Concerning the Long-Term Contract EIS.**

Defendant Intervenors additionally argue that Plaintiffs challenge the Interim Contracts prematurely because ongoing litigation concerning the impact of CVP and SWP operations on ESA-listed species will significantly impact the environmental reviews required by the Bureau for long-term contract renewal. Doc. 46-1 at 3. Defendant Intervenors maintain that because approval of long-term contracts is still "in progress" the Bureau has "taken the required steps to properly approve the interim contracts," leaving Plaintiffs "without the required standing" and requiring dismissal of their claims as "premature and not ripe." *Id*. These arguments ignore the fact that the FAC specifically alleges that the

Bureau's approval of the Interim Contracts violated NEPA. Plaintiffs' case rises and falls on those claims, not on their relationship to the long-term contracting process. Moreover, Defendant Intervenors do not raise any specific arguments suggesting Plaintiffs lack standing to sue.

## C.   **Failure to Join Indispensable Parties.**

Federal Defendants and Defendant Intervenors argue that to the extent Plaintiffs seek to "set aside" or "impair" the Interim Contracts, Plaintiffs claims should be dismissed because they have failed to join the contracting water districts as indispensable parties. *See* Doc 49 at 8; Doc. 50 at 5. Federal Rule of Civil Procedure 19, which governs the circumstances under which persons must be joined as parties to a lawsuit, provides in relevant part:

> (a) Persons Required to Be Joined if Feasible.
>
> > (1) Required Party. A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:
> >
> > > (A) in that person's absence, the court cannot accord complete relief among existing parties; or
> > >
> > > (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
> > >
> > > > (i) as a practical matter impair or impede the person's ability to protect the interest; or
> > > >
> > > > (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.
>
> ***
>
> (b) When Joinder Is Not Feasible. If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed. The factors for the court to consider include:
>
> > (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
> >
> > (2) the extent to which any prejudice could be lessened or avoided by:
> >
> > > (A) protective provisions in the judgment;

(B) shaping the relief; or

(C) other measures;

(3) whether a judgment rendered in the person's absence would be adequate; and

(4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

The district court in *Natural Res. Def. Council v. Kempthorne*, 539 F. Supp. 2d 1155, 1182-83 (E.D. Cal. 2008), succinctly summarized the relevant standard:

> The "[a]pplication of Rule 19 involves three successive inquiries." *Wilbur [v. Locke]*, 423 F.3d [1101,] 1111 [(9th Cir. 2005) abrogated on other grounds, *Levin v. Commerce Energy, Inc.*, 130 S. Ct. 2323 (2010)]. "First, the court must determine whether a nonparty should be joined under Rule 19(a)." The term "necessary" is used to describe those persons to be joined if feasible. *Id.* at 1112. "The inquiry is a practical one and fact specific, and is designed to avoid the harsh results of rigid application." *Shermoen v. United States*, 982 F.2d 1312, 1317 (9th Cir.1992). "If an absentee is a necessary party under Rule 19(a), the second stage is for the court to determine whether it is feasible to order that the absentee be joined." *Wilbur*, 423 F.3d at 1112. "Finally, if joinder is not feasible, the court must determine at the third stage whether the case can proceed without the absentee, or whether the absentee is an 'indispensable party' such that the action must be dismissed." *Id.*; *Shermoen* 982 F.2d at 1317 (a court must determine whether the absent party is "indispensable" "so that in 'equity and good conscience' the suit should be dismissed.").

The first inquiry is whether the absent water contractors are "necessary" parties to this lawsuit. This inquiry proceeds in two steps. "First, the court must decide if complete relief is possible among those already parties to the suit." *Id.* at 1183 (quoting *Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir. 1990)). "This analysis is independent of the question whether relief is available to the absent party." *Id.* "Next, the court must determine whether the absent party has a legally protected interest in the suit." *Id.* "If a legally protected interest exists, the court must further determine whether that interest will be impaired or impeded by the suit." *Id.* "Impairment may be minimized if the absent party is adequately represented in the suit." *Id.* "The court must also determine whether risk of inconsistent rulings will affect the parties present in the suit." *Id.* at 558-59 (emphasis in original).

Federal Defendants and Defendant Intervenors cite *NRDC v. Kempthorne* as an example of how Rule 19 should be applied in this case. There, a coalition of environmental groups challenged the Bureau's attempt to issue long term contracts "promising delivery of substantially increased quantities

29

of water" under the Endangered Species Act ("ESA"), arguing that entering into those contracts would constitute an unlawful "irretrievable and irreversible" commitment of resources that would foreclose implementation of corrective measures required under the ESA to protect listed species. Environmental plaintiffs in that case sought "to invalidate numerous water service contracts between the Bureau and various third parties." 539 F. Supp. 2d at 1180. After an extended discussion, the district court concluded that if environmental plaintiffs sought "to invalidate, rescind, or enjoin the Bureau's performance under water service contracts…" they must join all the absent contractors. *Id*. at 1192.

Here, however, the "public rights exception" to the joinder rules applies. "Under this exception, even if [the absent party is a] necessary party, [the absent party is] not deemed indispensable, and, consequently, dismissal is not warranted." *Kescoli v. Babbitt*, 101 F.3d 1304, 1311 (9th Cir.1996) (citing *Makah*, 910 F.2d at 559 n. 6). Generally, to fall within the public rights exception, "the litigation must transcend the private interests of the litigants and seek to vindicate a public right." *Id*. (internal citation omitted). For the exception to apply, the litigation must not "destroy the legal entitlements of the absent parties." *Id*. (citations omitted) (finding the public rights exception inapplicable because rights of absent parties under lease agreements "could be significantly affected" if the action proceeded in their absence).

This exception was applied in *Conner v. Burford*, 848 F.2d 1441, 1442-43, 1460 (9th Cir. 1988), to permit environmental groups to bring a NEPA and ESA challenge the sale of oil and gas leases in Montana without joining all of the lessees. The Ninth Circuit reasoned that "the litigation against the government does not purport to adjudicate the rights of current lessees; it merely seeks to enforce the public right to administrative compliance with the environmental protection standards of NEPA and the ESA." *Id*. at 1460. Likewise, in *Southern Utah Wilderness Alliance v. Kempthorne*, 525 F.3d 966, 967-68 (10th Cir. 2008), the Tenth Circuit applied the public rights exception to permit a NEPA challenge to BLM's issuance of leases on parcels of land in Utah. Although the district court's finding that BLM

violated NEPA effectively "froze" the leases pending NEPA compliance, the lessees were not indispensable parties. *Id*. at 969. In *Makah*, the Ninth Circuit concluded that third parties were not indispensable in an action that sought to require an agency follow certain procedures in establishing <u>future</u> fishing quotas. 910 F.2d at 559 n.6. In contrast, *Am. Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015, 1026 (9th Cir. 2002), refused to apply the exception where the relief sought would not only require adherence to certain procedures but also would prevent new gaming compacts that would cause competitive harm to the plaintiff. Because "the rights in issue between the [parties] are more private than public," the public rights exception did not apply. *Id*.

Here, Plaintiffs insist that they "do not seek to invalidate the interim contracts." Doc. 48 at 16. They simply wish to obtain "prospective injunctive relief that would only affect the future conduct of the administrative process." *Id*. This will operate to limit significantly any remedies available to Plaintiffs, but also confirms applicability of the public rights exception to the joinder rules. Plaintiffs seek to vindicate the public right to procedural compliance with NEPA. This "transcend[s] the private interests of the litigants and seek[s] to vindicate a public right," without "destroy[ing] the legal entitlements of the absent parties." *Kescoli*, 101 F.3d at 1311.

The motion to dismiss the FAC for failure to join indispensable parties is DENIED.

## IV. <u>CONCLUSION AND ORDER</u>

For the reasons set forth above:

(1) Federal Defendants' and Defendant Intervenors' motions to dismiss the FAC on the ground that Plaintiffs have waived their claims are DENIED;

(2) Federal Defendants' and Defendant Intervenors' motions to dismiss the FAC for failure to state a claim are

      (a) GRANTED WITHOUT LEAVE TO AMEND as to Plaintiffs' allegation that the no

      action alternative is unlawful;

31

(b) GRANTED WITHOUT LEAVE TO AMEND as to Plaintiffs' Second Claim for

Relief that Federal Defendants unlawfully failed to prepare an EIS;

(c) DENIED as to all other allegations in the FAC.

(3) Defendant Intervenors' motion to dismiss on the ground that Plaintiffs' challenges are

premature is DENIED;

(4) Federal Defendants' and Defendant Intervenors' motions to dismiss for failure to join

indispensable parties are DENIED in light of Plaintiffs' indication that the relief they seek is

limited.

**SO ORDERED**
**Dated: March 7, 2013**

> **/s/ Lawrence J. O'Neill**
> **United States District Judge**

32