**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS and SAN FRANCISCO CRAB BOAT OWNERS ASSOCIATION, INC.,<br><br>     **Plaintiffs,**<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR and UNITED STATES BUREAU OF RECLAMATION,<br><br>     **Defendants,**<br><br>**and**<br><br>WESTLANDS WATER DISTRICT, SAN LUIS WATER DISTRICT, and PANOCHE WATER DISTRICT,<br><br>     **Intervenor-Defendants.** | CASE NO.  1:12-CV-01303-LJO-MJS<br><br>**MEMORANDUM DECISION AND ORDER RE CROSS MOTIONS FOR SUMMARY JUDGMENT (DOCS. 68, 75, 78)** |

## I. INTRODUCTION

This case concerns approval by the United States Department of the Interior and its member

agency the United States Bureau of Reclamation (collectively, "Federal Defendants," "Reclamation," or

the "Bureau") of eight (8) interim renewal contracts ("Interim Contracts") which authorize delivery of

water from federal reclamation facilities to certain water districts served by the federal Central Valley

1

Project ("CVP") and provide for repayment of capital construction costs, as well as operational and maintenance expenses associated with CVP facilities. First Amended Complaint ("FAC"), Doc. 47 at ¶ 2. Plaintiffs' remaining claim alleges that Federal Defendants' issued a deficient Environmental Assessment ("EA") and associated Finding of No Significant Impact ("FONSI") prior to approval of the Interim Contracts, in violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*

Before the Court for decision are cross motions for summary judgment filed by all parties. Plaintiffs filed their motion for summary judgment on September 6, 2013. Doc. 68. On October 2, 2013, pursuant to a request from Federal Defendants, this case was stayed in light of the federal government shutdown, and the briefing schedule was suspended. Doc. 71. The stay expired on October 21, 2013, when appropriations were restored. Doc. 72. Federal Defendants' subsequent, unopposed motion for a ten-day extension of time was granted. Doc. 75. Federal Defendants filed an opposition to Plaintiffs' motion as well as a separate cross motion on November 7, 2013, although the two memoranda are identical. Docs. 75-77. Also on November 7, Defendant Intervenors, Westlands Water District, San Luis Water District, and Panoche Water District, also filed an opposition, as well as a distinct cross motion. Doc. 78-80. After receiving a 22-day extension of time, Doc. 82, Plaintiffs filed a reply to their own motion for summary judgment on December 26, 2013, as well as an opposition to Federal Defendants' cross-motion, and a separate opposition to Defendant Intervenors' cross-motion. Docs. 83-84. Federal Defendants and Defendant Intervenors also filed replies. Docs. 86-86.[1]

Having thoroughly reviewed the papers and those portions of the extensive Administrative Record ("AR") cited by the parties, the Court believes that the issues are sufficiently developed so as to obviate the need for oral argument. The Court therefore issues the following decision based upon the papers without a hearing pursuant to Local Rule 230(g).

---

[1] The briefs in this case, which exceed 180 pages of legal argument, are highly repetitive. In the future, these sophisticated parties and highly experienced counsel will do a better job of avoiding duplication or face sanctions for wasting the Court's dwindling resources.

## II. <u>BACKGROUND</u>

The CVP is "a system of dams, reservoirs, levees, canals, pumping stations, hydropower plants, and other infrastructure that distributes water throughout California's vast Central Valley." *San Luis Unit Food Producers v. United States*, 709 F.3d 798, 801 (9th Cir. 2013) (internal citation and quotation omitted). Although the CVP was originally planned by the State of California as a state project, the Federal government took over construction when California was unable to finance the project on its own. *See Ivanhoe Irrig'n Dist. v. McCracken*, 357 U.S. 275, 280 (1958); *S. Delta Water Agency v. United States*, 767 F.2d 531, 534 (9th Cir. 1985). "The essential components of the CVP have been operational since 1953 and certain of its facilities were in partial operation several years before." *S. Delta Water Agency*, 767 F.2d at 534.

> Facilities located in the northern portion of the Central Valley store waters of the Sacramento, Trinity, and American Rivers. These waters are transported south down the Sacramento River to the Sacramento-San Joaquin Delta, an area east of San Francisco Bay. The waters are then pumped from the Delta into the Delta Mendota Canal for southerly transportation to the San Joaquin River.

*Id.*

"The Bureau is the agency within the Department of the Interior charged with administering the CVP." *San Luis Unit Food Producers*, 709 F.3d at 801.

> Congress initially prioritized the purposes of the CVP as follows: "[T]he said dam and reservoirs shall be used, first, for river regulation, improvement of navigation, and flood control; second, for irrigation and domestic uses; and, third, for power." CVP Act § 2 (1937) (emphasis added). However, Congress amended the CVP Act in 1992 with the Central Valley Project Improvement Act, Pub. L. No. 102–575, 106 Stat. 4600 ("CVPIA"), which re-prioritized the purposes of the CVP. *O'Neill v. United States*, 50 F.3d 677, 686 (9th Cir. 1995). The hierarchy of purposes now reads, "[T]he said dam and reservoirs shall be used, first, for river regulation, improvement of navigation, and flood control; second, for irrigation and domestic uses and fish and wildlife mitigation, protection and restoration purposes; and, third, for power and fish and wildlife enhancement." CVPIA § 3406(a)(2) (emphasis added); CVP Act § 2. The CVPIA also requires that the Bureau operate the CVP to "meet all obligations under State and Federal law, including but not limited to the Federal Endangered Species Act, 16 U.S.C. 1531, *et seq.*" CVPIA § 3406(b).

*Id.* at 801-02.

Under Federal Reclamation law, the Bureau delivers waters from CVP facilities to users pursuant to contracts, which provide for the repayment of a share of the CVP's capital construction costs, along with a share of operational and maintenance costs. *See* 43 U.S.C. § 485h(e); *see also Grant County Black Sands Irrig'n Dist. v. U.S. Bureau of Reclamation*, 579 F.3d 1345, 1351-52 (Fed. Cir. 2009). These contracts, frequently called "water service contracts" or "repayment contracts," are the means by which some recovery of federal taxpayer investment in the CVP is legally tied to the delivery of water. *See id.*[2]

The CVPIA also provides for renewal of pre-existing long-term water service contracts for successive periods of up to 25 years. CVPIA § 3404(c)(1), Pub. L. No. 102–575, 106 Stat. 4600 (1992). The CVPIA specifically called for completion of a programmatic Environmental Impact Statement "EIS" pursuant to NEPA that would analyze

> the direct and indirect impacts and benefits of implementing this title, including all fish, wildlife, and habitat restoration actions and the potential renewal of all existing Central Valley Project water contracts. Such statement shall consider impacts and benefits within the Sacramento, San Joaquin, and Trinity River basins, and the San Francisco Bay/Sacramento-San Joaquin River Delta Estuary.

CVPIA § 3409 (emphasis added). Renewal of any long-term (i.e., 25-year) contract may not be authorized by Reclamation "until appropriate environmental review, including the preparation of the [PEIS] required in section 3409... has been completed." CVPIA § 3404(c)(1). This requirement culminated in adoption of the Central Valley Project Improvement Act Final Programmatic Environmental Impact Statement ("CVPIA PEIS"), which was completed in 1999. FAC at p.12. In January 2001, the Reclamation formally adopted the "Preferred Alternative" from the CVPIA PEIS in a Record of Decision ("CVPIA PEIS ROD"). AR 2418-2458. In addition, Reclamation began the process of preparing project-level EISs for long-term contract renewals for the West San Joaquin Division and

---

[2] Reclamation is also party to several other types of water contracts, including the so-called "Exchange Contracts" and "Sacramento River Settlement Contracts," the terms of which reflect the fact that certain water contractors held water rights prior to the construction and operation of the CVP and exchanged those rights for priority contractual rights to CVP water. *See Westlands Water Dist. v. United States*, 337 F.3d 1092, 1096-97 (9th Cir. 2003) (describing Exchange Contracts); *Natural Res. Defense Council v. Kempthorne*, 621 F. Supp. 2d 954, 959-70 (E.D. Cal. 2009) (describing history of the Sacramento River Settlement Contracts). These types of contracts are not at issue in this case.

4

San Luis Contractors. *See* FAC at 12. In September 2005, Reclamation prepared and released a draft EIS

for these long-term contract renewals, but no final EIS has yet been adopted. *See id.*

The CVPIA provides for the eventuality that long-term contracts might expire prior to

completion of appropriate environmental review:

> Contracts which expire prior to the completion of the environmental
> impact statement required by section 3409 may be renewed for an interim
> period not to exceed three years in length, and for successive interim
> periods of not more than two years in length, until the environmental
> impact statement required by section 3409 has been finally completed, at
> which time such interim renewal contracts shall be eligible for long-term
> renewal as provided above. Such interim renewal contracts shall be
> modified to comply with existing law, including provisions of this title.

CVPIA § 3404(c)(1).

This case concerns eight (8) such Interim Contracts, which authorize continuation of water

service on terms similar to previous Interim Contracts, which in turn continued water service previously

provided pursuant to pre-existing long-term water contracts. *See, e.g.,* AR 490-94 (Interim Contract No.

14-06-200-495A-IR3, concerning water service to Westlands Water District). The type of water service

contract at issue here does not guarantee that any particular volume of water will be delivered to the

contractor. This is, in part, because each Interim Contract incorporates by reference a shortage provision

that relieves the Bureau of liability for any direct or indirect damages arising from reduced deliveries to

as a result of, among other things, "actions taken by the Contracting Officer to meet legal obligations...."

*Natural Res. Def. Council v. Kempthorne*, 2008 WL 5054115 (E.D. Cal. Nov. 19, 2008), superseded in

part on other grounds and clarified on other grounds, 621 F. Supp. 2d 954, 627 F. Supp. 2d 1212 (E.D.

Cal. 2009), 2009 WL 2424569 (E.D. Cal. Aug. 6, 2009), 627 F. Supp. 2d 1212 (E.D. Cal. 2009), 2009

WL 2424569 (E.D. Cal. Aug. 6, 2009). Deliveries are routinely reduced to meet legal obligations under

the CVPIA, the Endangered Species Act ("ESA"), and various decisions issued by the State Water

Resources Control Board, among other things. *See generally San Luis & Delta-Mendota Water Auth. v.*

*United States*, 672 F.3d 676 (9th Cir. 2012). Accordingly, operational decisions, including decisions

about how much water must be dedicated to "meet legal obligations," rather than the Interim Contracts

5

themselves, actually control deliveries.[3]

On or about February 29, 2012, Reclamation issued a FONSI and EA regarding the "Three Delta Division and Five San Luis Unit Water Service Interim Renewal Contracts 2012-2014." FAC ¶ 25. Based on the FONSI and EA, Reclamation approved the eight Interim Contracts at issue in this case.[4] *See, e.g.*, AR 212. Water delivery pursuant to the new two-year Interim Contracts commenced on March 1, 2012; the contract expires February 28, 2014. *Id.*

### III. PROCEDURAL HISTORY

This case was originally filed in the Northern District of California on April 30, 2012, but was transferred to the Eastern District of California on August 6, 2012, because of the "long history of litigation involving the CVP and CVPIA in the Eastern District, and the Eastern District's familiarity with the background facts, contracts, and the relevant law." Doc. 10 at 10. The FAC, filed December 4, 2012, contained two causes of action, alleging, generally: (1) that the EA prepared by Federal Defendants in connection with the eight Interim Contracts is inadequate; and (2) that Federal Defendants should have prepared an EIS. Doc. 47.

Federal Defendants and Defendant Intervenors moved to dismiss both claims in the FAC. Docs. 45-46. A March 8, 2013, Order granted the motions in part. Doc. 52; *Pac. Coast. Fed'n of Fishermen's Assoc. v. U.S. Dep't of the Interior*, 929 F. Supp. 2d 1039, 1044-46 (E.D. Cal. 2013). Among other things, Plaintiffs, whose opposition to the motion to dismiss primarily focused upon undermining Federal Defendants' choice of a "status quo" alternative as the "No Action Alternative," appeared to

---

[3] It is indisputable that the underlined delivery of CVP water to contractors impacts the environment in significant ways. These impacts have been reviewed in numerous decisions. *See e.g., Consolidated Salmonid Cases*, 791 F. Supp. 2d 802, 959 (E.D. Cal. 2011) (NMFS' "BiOp's jeopardy conclusion is lawful. Project operations negatively impact the Listed Species and adversely modify their critical habitat in various ways that remain incompletely described and quantified."); *Consolidated Delta Smelt Cases*, 717 F. Supp. 2d 1021, 1070 (E.D. Cal. 2010) ("the premise . . . that the species may be jeopardized by increased negative flows occasioned by export pumping . . . has record support"); *Firebaugh Canal Co. v. United States*, 203 F.3d 568, 575 (9th Cir. 2000)(discussing Congress's "clear and manifest" intention to require Reclamation "to develop a plan that addresses the environmental problems posed by the discharge of agricultural effluent"). The extent to which Reclamation's operational decisions regarding delivery of water to contractors is subject to NEPA is not before the court, although the Court notes that certain operational decisions that post-date the enactment of NEPA have been found subject to NEPA. *See San Luis & Delta-Mendota Water Auth. v. Salazar*, 686 F. Supp. 2d 1026, 1044-49 (E.D. Cal. 2009).

[4] The Interim Contracts are with the City of Tracy, Pajaro Valley Water Management Agency, Santa Clara Valley Water District, Westlands Water District, Westlands Water District Distribution District #1, and Westlands Water District Distribution District #2. FAC at ¶ 25.

6

concede that that the Proposed Action, which proposed only a small water pricing difference from the No Action Alternative, would not alter the status quo. *See* Doc. 48 at 12-13 (indicating assent to the proposition that the No Action Alternative as defined in this EA was the continuation of the status quo). Accordingly, after finding the No Action Alternative to be appropriate, the Court dismissed Plaintiffs' second cause of action demanding that an EIS be prepared, relying in part on a line of cases which stand for the proposition that no EIS is required for a project that does not alter the status quo. Doc. 52 at 10-20. Plaintiffs did not request reconsideration of this ruling.

## IV. LEGAL STANDARD

"NEPA is our 'basic national charter for protection of the environment.' " *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.,* 538 F.3d 1172, 1185 (9th Cir. 2008) (quoting 40 C.F.R. § 1500.1) ("*NHTSA*"). "Although NEPA does not impose any substantive requirements on federal agencies, it does impose procedural requirements." *N. Idaho Cmty. Action Network v. U.S. Dept. of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008). "Through these procedural requirements, NEPA seeks to make certain that agencies will have available, and will carefully consider, detailed information concerning significant environmental impacts, and that the relevant information will be made available to the larger public audience. " *Id.* (internal citations and quotations omitted).

NEPA requires federal agencies to analyze the potential environmental impacts of any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). When an agency takes major federal action, the agency must prepare an EIS "where there are substantial questions about whether a project may cause significant degradation of the human environment." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005).

An agency may choose to prepare an environmental assessment ("EA") to determine whether an EIS is needed. 40 C.F.R. §§ 1501.4, 1508.9(b). An EA is meant to be a "concise public document … that serves to," among other things "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9; *see also Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1225 (9th Cir. 1988). Based on the

EA, the agency "may conclude that the action will not significantly affect the environment and issue a [FONSI]." *Bob Marshall*, 852 F.2d at 1225 (citing 40 C.F.R. § 1508.13).

An agency's compliance with NEPA is subject to review under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701, *et seq*., pursuant to which a reviewing court may set aside agency actions that are:

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (D) without observance of procedure required by law;
>
>                         ***

5 U.S.C. § 706(2).

Where a court is asked to review a factual dispute implicating "substantial agency expertise" of a technical nature, the court's determination "is controlled by the 'arbitrary and capricious' standard...." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 376 (1989).

> Review under the arbitrary and capricious standard is narrow, and we do not substitute our judgment for that of the agency. Rather we will reverse a decision as arbitrary and capricious only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Lands Council v. McNair,* 537 F.3d 981, 987 (9th Cir. 2008) (en banc) (internal quotations and citations omitted), overruled on other grounds by *Am. Trucking Ass'ns Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).

Certain agency decisions concerning the application of NEPA are not subject to the arbitrary and capricious standard. *See Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 727 (9th Cir. 1995). *Alaska Wilderness* concerned an agency's decision not to prepare an EIS based not upon "an assessment of the effects of [the action] on the environment," but, rather, on the "assessment of the

effects of the [action] on the EIS process." *Id.*; *see also Northcoast Envtl. Ctr. v. Glickman*, 136 F.3d 660, 667 (9th Cir. 1998) (holding that "the less deferential standard of 'reasonableness' applies to threshold agency decisions that certain activities are not subject to NEPA's procedures").

It is not entirely clear which of these two standards applies to the arguments raised in the present motions. The "reasonableness standard" appears to be reserved for situations in which the agency categorically excludes a particular type of action from NEPA review. *See, e.g., San Luis Obispo Mothers for Peace v. Nuclear Regulatory Com'n*, 449 F.3d 1016, 1028 (9th Cir. 2006) (reviewing an EA concerning construction of a radioactive waste storage site and applying "reasonableness" standard to action agency's conclusion that the possible risk of a terrorist attack upon the site did not warrant evaluation because the chance of such an attack was too remote). This is supported by *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1070 (9th Cir. 2002), which held:

> An agency's threshold decision that certain activities are not subject to NEPA is reviewed for reasonableness. *See Northcoast*, 136 F.3d at 667. An agency's decision not to prepare an EIS once that agency has prepared an EA is reviewed for abuse of discretion, and will be set aside only if it is "arbitrary and capricious." *Marsh v. ONRC*, 490 U.S. 360, 376-77 (1989) [additional citation].

The Supreme Court has noted, however, that "the difference between the 'arbitrary and capricious' and 'reasonableness' standards is not of great pragmatic consequence." *Marsh*, 490 U.S. at 377 n. 23 (1989). Moreover, as the discussion below reveals, there are a limited number of substantive NEPA arguments actually addressed in this Memorandum Decision and Order. The Court believes that the outcome of those arguments would be the same, regardless of the technical standard applied.

Regardless of the scope of discretion, judicial review under the APA is limited to the Administrative Record before the agency at the time the challenged decision was made. *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000).

//

//

9

# V. <u>DISCUSSION</u>

## A.  <u>Does NEPA Apply?</u>

Federal Defendants advance the threshold argument that NEPA "does not apply" to this case at all. Doc. 76 at 8. It is true that NEPA does not apply retroactively to agency actions that occurred before the effective date of the statute, January 1, 1970. *Upper Snake River Chapter of Trout Unlimited v. Hodel*, 921 F.2d 232, 234 (9th Cir. 1990) (no EIS required on the basis of construction of dam completed in 1956). However, "if an ongoing project undergoes changes which themselves amount to 'major Federal actions,' the operating agency must prepare an EIS." *Id.*[5] As mentioned above, relying on *Upper Snake River* and its progeny, the March 8, 2013 Decision concluded that no EIS was required here because Plaintiffs appeared (at least at that time) to have conceded that the proposed action did not change the status quo. Doc. 52 at 20.

Now, Federal Defendants appear to be advancing a different proposition: that <u>no requirements of NEPA</u>, not even the requirements regarding the content of an EA, apply to the renewal the interim contracts at issue in this case. This proposition was addressed in the March 8, 2013 Decision:

> The [Court's conclusion that no EIS is required] does not automatically obviate the remainder of Plaintiffs' claims regarding the content of the EA. Under some, unique circumstances, a finding that no EIS is required would automatically obviate the need for any EA. *See Douglas County v. Babbitt*, 48 F.3d 1495, 1505 (9th Cir. 1995) (given that preparation of an EIS is never required for a designation of critical habitat under the ESA, because Congress intended for ESA critical habitat procedures to replace NEPA requirements, the agency's failure to prepare an EA did not violate NEPA). However, although preparation of an EA is arguably "optional" under NEPA, *Grand Canyon Trust v. U.S. Bureau of Reclamation,* 691 F.3d 1008, 1013 (9th Cir. 2012) ("An agency undertaking a major federal action may first prepare an [EA] to determine whether an EIS is necessary."), an agency that chooses to prepare an EA gains the benefit of a more relaxed standard of review of any decision not to prepare an EIS, *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 640 (9th Cir. 2004)

---

[5] Plaintiffs suggest that this line of cases only applies to projects that originated prior to the enactment of NEPA and remain unchanged since that time. While many of the cases do concern such situations, the Ninth Circuit has suggested that the doctrine is not so limited. *See Grand Canyon Trust*, 691 F.3d at 1021-22 (focusing on whether the ongoing action would change the status quo, reasoning that "[t]he time for an agency to give a hard look at environmental consequences, and the opportunity for serious NEPA litigation on whether alternatives were adequately considered, should come in this context at the points where an agency establishes operating criteria for a [project], or embarks on some significant shift of direction in operating policy, not merely when there is routine and required [act]").

("Typically, an agency's decision not to prepare an EIS is reviewed under the arbitrary and capricious standard; however, where an agency has decided that a project does not require an EIS without first conducting an EA, we review under the reasonableness standard.").

In addition, NEPA contains separate, specific requirements regarding the content of an EA:

>   Environmental Assessment:
>
>   (a) Means a concise public document for which a Federal agency is responsible that serves to:
>
>   > (1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.
>   >
>   > (2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.
>   >
>   > (3) Facilitate preparation of a statement when one is necessary.
>
>   (b) Shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

40 C.F.R. § 1508.9. An EA that is followed by a FONSI must provide sufficient information  and detail to demonstrate that the agency took the required "hard look" at the environmental consequences of the project before concluding that those impacts were insignificant. *Save the Yaak Comm. v. Block*, 840 F.2d 714, 717 (9th Cir. 1988) ("[A]n agency's decision not to prepare an EIS will be considered unreasonable if the agency fails to supply a convincing statement of reasons why potential effects are insignificant."). To be adequate, an EA, like an EIS, must analyze cumulative impacts and respond to public comments concerning the project. *Native Ecosystems*, 304 F.3d at 893, 896; *Found. for North Am. Wild Sheep v. U.S. Dept. of Agr.*, 681 F.2d 1172, 1178 (9th Cir. 1982). Furthermore, the conclusions in the EA must be supported by "some quantified or detailed information," and the underlying environmental data relied upon to support the expert conclusions must be made available to the public. *Klamath–Siskiyou Wildlands v. Bureau of Land Mgmt.,* 387 F.3d 989, 993, 996 (9th Cir. 2004).

These requirements suggest that once an agency elects to prepare an EA, the EA is subject to independent review, even if it has already been determined that no EIS is required. *See Natural Res. Def. Council, Inc. v. U.S. Forest Serv.*, 634 F. Supp. 2d 1045, 1059-60 (E.D. Cal. 2007) (requiring consideration of alternatives, albeit a more limited number, in an EA, even where EIS is not required); *Sabine River Auth. v. U.S. Dept.*

1

2

3

*of Interior*, 745 F. Supp. 388, 394 (E.D. Tex. 1990), aff'd, 951 F.2d 669
(5th Cir. 1992) (independently analyzing challenges to the content of an
EA after rejecting challenge to agency's failure to prepare EIS on the
ground that the project did not alter the status quo). Federal Defendants do
not point to any authority suggesting otherwise.

4

5

Doc. 52 at 20-22. Federal Defendants did not move for reconsideration of this ruling, nor have they

presented any authority calling into question the Court's reasoning.

6

7

8

9

10

11

12

13

14

15

The Court acknowledges that, at first glance, this ruling appears to leave alive only a purely

academic claim challenging the content of an EA, a document designed to help an agency determine

whether to prepare an EIS, when it has already been determined that an EIS is not required. But such a

challenge is not purely academic, because ensuring that the content of an EA comports with NEPA's

legal requirements advances one of the purposes of NEPA: to "inform those persons and agencies who

may be interested [in] or affected" by a federal agency's actions, 40 C.F.R. § 1506.6. *See also Swanson*

*v. U.S. Forest Serv.*, 87 F.3d 339, 343 (9th Cir. 1996) ("NEPA is a procedural statute. Its purpose is to

ensure informed agency action."). As discussed in the March 8, 2013 Decision, the Code of Federal

Regulations contains specific provisions governing the content of an EA. *See* 40 C.F.R. § 1508.9. The

APA permits Plaintiffs to challenge Federal Defendants' compliance with this provision.

16

17

18

19

20

21

22

23

24

The Court also acknowledges that some Ninth Circuit cases contain language that does appear to

suggest that NEPA does not apply at all where the proposed action does not change the status quo. For

example, in *Grand Canyon Trust v. U.S. Bureau of Reclamation*, 691 F.3d 1008, 1021-22 (9th Cir.

2012), the Ninth Circuit found that Reclamation's issuance of an Annual Operating Plan ("AOP") that

merely chronicles Reclamation's ongoing operation of a Dam under pre-existing operating criteria was

not a major federal action requiring "compliance with NEPA procedures." There, the Ninth Circuit

specifically agreed that "AOPs are not major federal actions for which NEPA requires that an EA and/or

EIS be prepared." *Id*. at 1021 (emphasis added). Yet, *Grand Canyon* did not involve a challenge to the

content of an EA voluntarily prepared by an agency.[6] Moreover, the presence of a "major Federal

25

26

---

[6] Nor was the content of an EA at issue in *Upper Snake River* or other closely related cases. *See, e.g., Upper Snake River*, 921

action" is only a pre-requisite for the preparation of an EIS. By definition, it could not be a pre-requisite to the preparation of an EA, as that document is meant to be "a concise public document ... that serves to," among other things, "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact," and "aid an agency's compliance with the Act when no environmental impact statement is necessary." 40 C.F.R. § 1508.9(a)(1-2).

In sum, the Court's previous ruling on this issue is the law of the case. Even though it has already been determined that no EIS was required, NEPA still applies to the content of an existing EA, and Plaintiffs may challenge the content that EA here.

There is one caveat to this conclusion. As discussed above, relying on *Upper Snake River*, the March 8, 2013 Decision concluded that no EIS was required in this case, after finding that Plaintiffs had conceded the Proposed Action would not alter the status quo. Plaintiffs now advance numerous arguments that directly conflict with this conclusion, and with the implied concession Plaintiffs made in their opposition to the motion to dismiss, a concession that was discussed in the March 8, 2013 Decision. *See* Doc. 52 at 20. Among other things, Plaintiffs now argue that while the Proposed Action might not alter the "contractual status quo," it will alter the "environmental status quo" because of the "deteriorating condition of the Delta" and the "bioaccumulative nature of selenium," a pollutant associated with the application of irrigation water to agricultural lands in the areas served by the contracts at issue in this case. Doc. 85 at 8. Plaintiffs also contend that *Upper Snake River* and its progeny do not control here because the contract volumes allocated to the contractors in question have changed since the enactment of NEPA. Doc. 85 at 6. In addition, Plaintiffs make numerous arguments about the content of the impacts analyses in the EA that, if accepted, would conflict with the March 8, 2013 Decision's conclusion that the Proposed Action would not alter the status quo. *See* Doc. 68-1 at 18-25. These arguments are not timely presented, *see* Fed. R. Civ. P. 60, and cannot be considered here.

---

F.2d 232 (no EA at issue); *Burbank Anti–Noise Group v. Goldschmidt*, 623 F.2d 115, 116 (9th Cir. 1980) (same).

The previous ruling on the EIS claim is also law of this case and is therefore fatal to many of Plaintiffs'

arguments.

**B.    Waiver.**

The March 8, 2013 Decision addressed Federal Defendants argument, joined by Defendant

Intervenors, that Plaintiffs waived all of the claims in the FAC because they did not provide any

comments to Federal Defendants during the NEPA process. Doc. 52 at 6-7. Federal Defendants' motion

focused on the fact that Federal Defendants received only two comment letters during the NEPA

process, neither of which was authored by any of the Plaintiffs in this case. Doc. 45 at 6-8; *see also* AR

5068-5072 (comment letter from North Coast Rivers Alliance, California Sportfishing Protection

Alliance, Friends of the River, and the Winnemem Wintu Tribe); AR 5076- 5079 (Letter from the

Hoopa Valley Tribe).

The general standard is well established. The APA requires that plaintiffs exhaust administrative

remedies before bringing suit in federal court. *Great Basin Mine Watch v. Hankins,* 456 F.3d 955, 965

(9th Cir. 2006). In the NEPA context, this means that a plaintiff "must structure [its] participation so that

it ... alerts the agency [of its] positions and contentions, in order to allow the agency to give the issue[s]

meaningful consideration." *Id.* (quoting *Dep't of Transp. v. Pub. Citizen,* 541 U.S. 752, 764–65 (2004)).

The purpose of the exhaustion requirement is to avoid premature claims and to ensure the agency is

given "a chance to bring its expertise to bear to resolve a claim." *Id.* "[A] claimant need not raise an

issue using precise legal formulations, as long as enough clarity is provided that the decision maker

understands the issue raised." *Lands Council v. McNair,* 629 F.3d 1070, 1076 (9th Cir. 2010) (internal

quotation and citation omitted). Accordingly, "alerting the agency in general terms will be enough if the

agency has been given a chance to bring its expertise to bear to resolve the claim." *Id.* If a plaintiff fails

to meet exhaustion requirements, its claim is waived. *See Pub. Citizen,* 541 U.S. at 764–65.

After reviewing a number of district court decisions from within the Ninth Circuit, the March 8,

2013 Decision concluded that "[s]everal district courts, including several within this Circuit and one

within this District, have concluded that comments submitted by third parties may form the basis of a

NEPA lawsuit, so long as the comments brought sufficient attention to the issue." Doc. 52 at 6-7 (*citing, e.g., Conservation Congress v. U.S. Forest Service*, 555 F. Supp. 2d 1093, 1106 (E.D. Cal. 2008) (rejecting agency argument that plaintiffs failed to raise an issue at the administrative level because "[t]here is no need for a litigant to have personally raised the issue, so long as the issue was raised by another party and the agency had the opportunity to consider the objection")).

On Summary judgment, Defendant Intervenors now raise the related, but not identical, argument that Plaintiffs waived certain <u>specific</u> claims because those claims were not raised in either of the comment letters provided to Federal Defendants during the NEPA review process. Doc. 80 at 6 & n.3. Plaintiffs only response to this new argument is to point out, correctly, that the March 8, 2013 Decision indicated that "[t]he content of the FAC appears to track the letter [submitted by other conservation organizations] almost exactly, and the letter, although it "need not raise an issue using precise legal formulations," provides "enough clarity [to ensure] the decision maker understands the issue raised." *PCFFA v. DOI*, 929 F. Supp. 2d at 1046 (citing *Lands Council*, 629 F.3d at 1076). However, this general statement was made in response to the general argument that Plaintiffs' <u>entire case</u> should be dismissed because <u>no named Plaintiff</u> actually submitted comments during the administrative process. The Court's statement does not preclude the more specific waiver challenge made by Defendant Intervenors in the present motions for summary judgment. *Milgard Tempering, Inc. v. Selas Corp. of Am.*, 902 F.2d 703, 716 (9th Cir. 1990) ("Of course, the law of the case doctrine gives no preclusive effect to dicta.").

The question then becomes whether the comment letters in the record "alert[ed] the agency to [Plaintiffs'] position and contentions, in order to allow the agency to give the issue meaningful consideration." *Pub. Citizen,* 541 U.S. at 764 (internal quotation and citation omitted). A plaintiff exhausts its administrative remedies if, "taken as a whole," the comments in the record "provided sufficient notice to the [agency] to afford it the opportunity to rectify the violations that the plaintiffs alleged," even if "a much less refined legal argument" was presented during the administrative process, *Native Ecosystems Council v. Dombeck,* 304 F.3d 886, 898-99 (9th Cir. 2002). This approach comports

with the purposes of the exhaustion requirement by "avoiding premature claims and ensuring that the agency be given a chance to bring its expertise to bear to resolve a claim." *Id.* at 900. "Requiring more might unduly burden those who pursue administrative appeals unrepresented by counsel, who may frame their claims in non-legal terms rather than precise legal formulations." *Id.*[7] There is no bright-line standard as to when this requirement has been met; courts must consider exhaustion arguments on a case-by-case basis. *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 965 (9th Cir. 2002).

The Ninth Circuit applied the standard from *Dombeck* in *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 965 (9th Cir. 2006), where the Reclamation argued that an environmental plaintiff waived its argument that groundwater discharged from a project would violate federal and state water quality standards. *Id.* In its comment letter to Reclamation on the project's draft EIS, environmental plaintiff wrote:

> "The [Amended South Project] indicates that groundwater released into Maggie Creek does not need to be treated, since the combined discharged water does not exceed the water quality standards established by the NPDES system.... This statement is different than saying that no impacts will occur. What are the water quality measurements in the Creek and in the discharged water? Are arsenic or TDS amounts increased over what exists naturally in Maggie Creek? Does the total amount of contaminants discharged add a significant amount to the total loads in the Humboldt River downstream?"

*Id.* The Ninth Circuit found this was sufficient to preserve the claim for judicial review because "Great Basin clearly expressed concern about the current and future levels of toxins in the discharged water, and the Bureau was on notice of these concerns." *Id.*

In *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058 (9th Cir. 2010), the Ninth Circuit considered a challenge to a federal agency's approval of a land exchange agreement. A private developer sought to build a landfill on a former mining site. *Id.* at 1062. As part of its development plan, the private developer sought to exchange certain private lands for several parcels of

---

[7] A plaintiff may escape the exhaustion requirement when an argument is "so obvious that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action." *Pub. Citizen,* 541 U.S. at 765. In order for the "so obvious" standard to apply, the agency must have independent knowledge of the issues that concern petitioners. *Barnes v. United States Dep't of Transp.,* 655 F.3d 1124, 1132 (9th Cir. 2011). Plaintiffs have not argued that this exception applies here.

surrounding land owned by the Bureau of Land Management ("BLM"). *Id*. BLM approved the exchange over the objection of conservationists, who eventually argued in court that the BLM failed to consider whether a landfill was the "highest and best use" of the public parcels to be exchanged. *Id*. at 1065. The private developer and BLM argued that the conservation plaintiff failed to exhaust this issue during the administrative process. *Id*. The Ninth Circuit closely examined objections submitted by Plaintiff during the administrative process, which stated:

> THE BLM WILL NOT RECEIVE FAIR MARKET VALUE FOR THE EXCHANGE. Any disposal of federal lands must be compensated at "fair market value of the use of public lands and their resources." 43 U.S.C.A. § 1701(a).... Kaiser will also pay BLM a lump sum of $20,100, which is below the *fair market value.* Kaiser anticipates huge profits *from a landfill operation* on the undervalued BLM land....

*Id*. at 1065-66 (emphasis included in Ninth Circuit opinion). Elsewhere in the administrative record, individual plaintiffs argued that "the public should receive fair appraisal for its lands," and "[n]ot an appraisal that has been artificially reduced in value through instructions to discount developments, improvements, and recent zoning changes." *Id*. at 1066. The Ninth Circuit concluded that these statements "adequately raised the highest and best use issue" because they "highlighted the BLM's failure to appraise the land's fair market value *as a landfill*" and because "[t]he highest and best use analysis is an integral part of the appraisal process." *Id*. (emphasis in original)(citing 43 C.F.R. § 2201.3-2(a)(1) ("In estimating market value, the appraiser shall: (1) Determine the highest and best use of the property to be appraised[.]")). This provided "sufficient notice to address the highest and best use issue." *Id*.

Here, of the two letters submitted in connection with the contracts at issue in this case, one, drafted by the Hoopa Valley Tribe, does not relate to the claims in this case. AR 5076-79 (addressing funding for Trinity River restoration, flows for the Trinity River basin, Trinity River salmonid habitat, and tribal trust assets in the Trinity River basin). The remaining letter, authored by counsel for the present Plaintiffs on behalf of a coalition of environmental organizations (hereinafter "Coalition Comment Letter") is five pages in length and maintains, generally, that:

17

(A) The EA's No Action Alternative improperly assumes that non-renewal of the existing contracts is infeasible, arguing that the CVPIA "expressly permits reclamation not to renew an interim contract." Moreover, even if the CVPIA did not give Reclamation discretion not to renew the contracts, NEPA nevertheless requires the No Action Alternative to be non-renewal of the contracts.

(B) The EA fails to consider a reasonable range of alternatives, because the only alternative considered was the No Action Alternative, which was identical to the Proposed Action except for a slight difference in pricing. A proper range of alternatives would have considered interim contract renewals in at amounts less than the current allocation along with nonrenewal of the contracts.

(C) The EA's entire analysis is fatally skewed by Reclamation's lack of discretion to consider a non-renewal or altered volume contract alternative. Specifically, this skews the impacts analysis because the EA "invariably concludes that the water deliveries would continue with or without the renewal contracts, and therefore Reclamation's action has no effect on the environment." Also, this permits the EA to avoid discussing the impacts of contract renewal on Reclamation's compliance with other environmental statutes, such as the Migratory Bird Treaty Act, the Fish and Wildlife Coordination Act, the Endangered Species Act, the National Historic Preservation act, and the Clean Water Act, because it permits Reclamation to claim, erroneously, that renewals are mandatory and thus change nothing.

(D) The EA ignores most of the Project's impacts by limiting the Study Area to the lands receiving the water deliveries, rather than including impacts to the water sources, which are "plainly significant."

AR 5068-5071.

Defendant Intervenors contend that the Coalition Comment Letter failed to alert Federal Defendants to Plaintiffs' concerns: (1) that the purpose and need statement of the EA is inadequate;

18

(2) that it was inappropriate for Federal Defendants to rely on (a) certain biological opinions and/or

(b) the water needs assessments appended to the EA/FONSI; or (3) that the analysis with respect to

impacts on the Giant Garter Snake or California Least Tern is inadequate. Doc. 80 at 7.[8]

### 1. **Purpose and Need Statement.**

EAs must "include [a] brief discussion[] of the need for the proposal...." 40 C.F.R. § 1508.9(b).

Here, the EA offers the following "Purpose and Need" statement:

> As described [elsewhere in the EA], long-term contract renewal for San
> Luis Unit contractors is still pending. <u>The purpose of the Proposed Action
> is to execute eight interim contracts in order to extend the term of the
> contractors' existing interim renewal contracts for two years, beginning
> March 1, 2012 and ending February 28, 2014</u>. Execution of these eight
> interim contracts is needed to continue delivery of CVP water to these
> contractors, and to further implement CVPIA Section 3404(c), until their
> new long-term contract can be executed.
>
> Interim renewal contracts are needed to provide the mechanism for the
> continued beneficial use of the water developed and managed by the CVP
> and for the continued reimbursement to the federal government for costs
> related to the construction and operation of the CVP by the contractors.
> Additionally, CVP water is essential to continue agricultural production
> and municipal viability for these contractors.

AR 5003 (emphasis added). Plaintiffs argue in their summary judgment motion that the EA's "purpose

and need" statement is inadequate because it is based on the agency's erroneous assumption that "it had

no discretion to consider" a broader purpose and range of options. Doc. 68-1 at 9. The Coalition

Comment Letter does raise the general concern that the EA is flawed because the agency erroneously

assumed that it had no discretion to consider non-renewal of the contracts or renewal at reduced

volumes. Although the Coalition Comment Letter focuses on the impact of this failure on the

alternatives considered, an agency's definition of a project's purpose and need is closely related to and

arguably inseparable from whether appropriate alternatives were considered. *See Friends of SE's Future

v. Morrison*, 153 F.3d 1059, 1066-67 (9th Cir. 1998) (discussing interplay between purpose and need

and alternatives selection). In light of the Ninth Circuit's clear pronouncement that so long as the agency

---

[8] It appears that additional arguments relied upon in Plaintiffs summary judgment may not have been raised properly in the Coalition Comment Letter. However, Defendant Intervenors limited their motion to these arguments.

has been "provided sufficient notice ... to afford it the opportunity to rectify the violations that the plaintiffs alleged," an issue will not be deemed waived for failure to exhaust even though commentators "presented a much less refined legal argument" during the administrative process, the Court finds Plaintiffs have sufficiently exhausted the argument that the purpose and need statement is inadequate because it is based on the agency's erroneous assumption that "it had no discretion to consider" a broader purpose and range of options.

Defendant Intervenors' motion for summary judgment that Plaintiffs' challenge to the purpose and need statement has been waived is DENIED.

## 2.      Critiques of Reclamation's Reliance on Data.

Defendant Intervenors next challenge whether the Coalition Comment Letter sufficiently questioned "any deficiency in the data relied upon, such as biological opinions [issued pursuant to the Endangered Species Act] or the water needs assessments." Doc. 80 at 7.

With respect to biological opinions, the Court is unable to locate anywhere in the FAC or Plaintiffs' motion for summary judgment where Plaintiffs assert that any biological opinion cited in the EA is itself deficient. Plaintiffs do assert that it is legally impermissible for the EA to equate "no jeopardy" findings in certain biological opinions with the absence of harm to the species in question. Whether the Coalition Comment Letter provides Federal Defendants with sufficient notice of this issue is discussed below.

Plaintiffs' motion for summary judgment does specifically contend that the "water needs assessments" relied upon by Reclamation were deficient. This challenge is embedded within Plaintiffs' broader argument that the EA is flawed in part because Reclamation erroneously assumed it did not have the discretion to reduce contract quantities. Doc. 68-1 at 9-18. In the EA, Reclamation preliminarily considered, but rejected, an alternative that would have reduced contract water quantities, in part because, after performing water needs assessments for all CVP contractors, Reclamation concluded that each "contractor's water needs equaled or exceeded the current total contract quantity." AR 5011; *see also* 5013-14; 5058-61. In their Summary Judgment motion, Plaintiffs maintain that Reclamation's

water needs assessments were flawed because they did not take into consideration the fact that some land within the areas serviced by the contracts had been permanently retired. Doc. 68-1 at 10-12, 14.

Defendant Intervenors argue that Plaintiffs have waived this argument because it is nowhere mentioned in the Coalition Comment Letter. Defendant Intervenors are correct. While the comment letter does raise the general concern that Reclamation improperly limited the range of alternatives considered in the EA because the improperly assumed it did not have discretion to reduce contract quantities, the letter nowhere mentions water needs assessments, land retirement, or the concept of beneficial use. The letter simply does not put Reclamation on notice that Plaintiffs had any objection to the manner by which Reclamation computed the water needs of the relevant contractors. As broad as the Ninth Circuit's standard may be, permitting this argument to proceed would totally defeat one of the key purposes of the exhaustion requirement: to ensure the agency is given "a chance to bring its expertise to bear to resolve a claim." *Great Basin,* 456 F.3d at 965.

Defendant Intervenors' motion for summary judgment that Plaintiffs' challenge to the sufficiency of the water needs assessments has been waived is GRANTED. This conclusion extends to the aspect of Plaintiffs' challenge to the purpose and need statement that is premised upon deficiencies in the water needs assessments.

**3.      Analysis of Impacts on Giant Garter Snake or California Least Tern.**

Plaintiffs' motion for summary judgment also argues that the EA's analysis of the giant garter snake and the California least tern impermissibly equates a finding of no jeopardy under the ESA with a finding of no significant impact under NEPA. The Coalition Comment Letter does generally protest that the EA's impacts analysis is flawed because it does not address how contract renewal will impact Reclamation's ability to comply with other laws, including the Migratory Bird Treaty Act and the ESA. AR 5071-72. But, the letter makes no mention of the giant garter snake or the California least tern. Nor does the letter even hint at the specific legal objection raised in these motions: that it is improper to equate a finding of no jeopardy with a finding of no significant impact under NEPA. Plaintiff has not provided the agency with any notice of this argument, which will not be addressed on the merits.

Defendant Intervenors' motion for summary judgment that Plaintiffs have waived their

arguments based upon the California least tern and giant garter snake is GRANTED.

**C.   Remaining Alleged Deficiencies in the EA.**

**1.   Purpose and Need Statement.**

As mentioned above, an EA "[s]hall include [a] brief discussion[]s of the need for the

proposal...." 40 C.F.R. § 1508.9(b). In applying the related requirement that a full EIS shall "briefly

specify the underlying purpose and need to which the agency is responding in proposing the alternatives

including the proposed action," 40 C.F.R. § 1502.13, the Ninth Circuit has afforded agencies

"considerable discretion" in defining the purpose and need of a project. *Friends*, 153 F.3d at 1066

(citing *City of Angoon v. Hodel*, 803 F.2d 1016 (9th Cir. 1986)). In *City of Angoon*, for example, the

Ninth Circuit examined the adequacy of an EIS prepared in conjunction with the issuance of a permit for

construction and operation of a logging facility. *See* 803 F.2d at 1017. The district court had held that

the EIS was inadequate under NEPA because it failed to consider an alternative under which the land on

the island could be exchanged for land elsewhere. *See id*. In reaching this conclusion, the district court

rejected the agency's statement of the permit's purpose. The Ninth Circuit reversed, explaining:

> The district court attacked the Corps' statement of the permit's purpose.
> Purporting to rely on the Corps' regulations, the district court restated the
> purpose in terms of a broad, generic public benefit: "commercial timber
> harvesting." ... The Corps characterized the relevant "purpose and need"
> as providing a "safe, cost effective means of transferring timber...." The
> district court erred when it adopted as the "purpose and need" the even
> broader concept "commercial timber harvesting." This formulation
> appears to make a broad social interest the exclusive "purpose and need."
> The Corps' statement is more balanced. We have said before, "The
> preparation of [an EIS] necessarily calls for judgment, and that judgment
> is the agency's." Acceptance of the Corps' statement of purpose makes
> consideration of the exchange alternative irrelevant. When the purpose is
> to accomplish one thing, it makes no sense to consider the alternative
> ways by which another thing might be achieved.

*Id*. at 1021 (internal citations omitted).

Nevertheless, the discretion afforded the agency is not unlimited. "[A]n agency cannot define its

objectives in unreasonably narrow terms. *Friends*, 153 F.3d at 1066 (citing *City of Carmel-By-The-Sea*

v. U.S. Dep't of Transp., 123 F.3d 1142, 1155 (9th Cir. 1997)); see also City of New York v. United States Dep't of Transp., 715 F.2d 732, 743 (2d Cir. 1983) ("[A]n agency will not be permitted to narrow the objective of its action artificially and thereby circumvent the requirement that relevant alternatives be considered."). According to the Ninth Circuit's own reading of this line of cases: "The combined teaching of City of Angoon and City of Carmel-by-the Sea is that the [agency's] statement of purposes is to be evaluated under a reasonableness standard." Friends, 153 F.3d at 1066-67. An EA's purpose and need statement may be fatally flawed if it is based on the agency's erroneous assumption that "it had no discretion to consider" a different purpose. NHTSA, 538 F.3d at 1219.

Here, the stated purpose of the Propose Action "is to execute eight interim contracts in order to extend the term of the contractors' existing interim renewal contracts for two years, beginning March 1, 2012 and ending February 28, 2014." AR 5003. Plaintiffs maintain that Reclamation interpreted this language to mean that the purpose of the Proposed Action is to extend the contracts at existing quantities, because, according to Plaintiffs, Reclamation erroneously believes that it lacks authority to reduce contract quantities. Doc. 68-1 at 9.[9] Plaintiffs' contention on this point is belied by the EA itself, which clearly considers an alternative that would reduce contract water quantities. The EA provides four reasons for rejecting this alternative, which are discussed below, none of which are based upon any inconsistency with the purpose of the Proposed Action. Nothing in the record suggests that Reclamation considered the purpose of the action to be anything other than as stated: to renew the contracts. Reclamation's decision to reject a reduced quantity alternative must stand or fall based upon the reasons the agency actually gave. Plaintiffs' motion for summary judgment that the purpose and need statement was unlawful is DENIED; Federal Defendants' and Defendant Intervenors' Cross Motions are GRANTED.

---

[9] Plaintiffs' motion for summary judgment actually advances the following two-pronged argument: "Reclamation's narrow purpose – to approve new interim contracts that continue existing contract quantities – is based on the twin invalid assumptions that (1) Reclamation lacks authority to reduce deliveries and (2) the contractors will beneficially use their entire contracted quantities." Doc. 68-1 at 9. While Plaintiffs' attack upon the first assumption will be considered, the second is premised upon Plaintiffs' challenge to the water needs assessments. As discussed above, this argument has been waived and will not be addressed here, except to point out that waiver.

**2.    Range of Alternatives Considered.**

**a.    Rejection of the Reduced Quantity Alternative.**

NEPA requires the agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). This "alternatives provision" applies whether an agency is preparing an EIS or an EA, and requires the agency to give full and meaningful consideration to all reasonable alternatives. *Native Ecosystems,* 428 F.3d at 1245. "Although an agency must still 'give full and meaningful consideration to all reasonable alternatives' in an environmental assessment, the agency's obligation to discuss alternatives is less than in an EIS." *Western Watersheds Project v. Abbey,* 719 F.3d 1035, 1050 (9th Cir. 2013) (internal citations and quotations omitted). "The existence of a viable but unexamined alternative renders an [EA] inadequate." *Id.*

Here, the EA considered four alternatives:

(1) The No Action Alternative, defined as "the continued delivery of CVP water under the interim renewal of existing contracts ...." in the form that those contracts took when they were considered as part of the Preferred Alternative of the CVPIA PEIS "adapted to apply for an interim period." AR 5009. This means that the contract terms, including the quantity/volume term, would remain the same as in the previous contracts. *See id.*

(2) The Proposed Action, defined as the execution of the eight interim renewal water contracts "with only minor, administrative changes to the contract provisions to update the previous interim renewal contracts for the new contract period." *Id.*

(3) Non-Renewal of Contracts. AR 5010-11.

(4) Reduction in Interim Renewal Contract Water Quantities (hereinafter, the "Reduced Quantity Alternative"). AR 5011.

The Non-Renewal and Reduced Quantity Alternatives were "considered but eliminated from further analysis." AR 5010-11.

24

NEPA and its implementing regulations require the following with respect to the alternatives that must be considered by an agency:

> 1) the agency must consider "appropriate" alternatives to recommended courses of action, 42 U.S.C. § 4332(2)(E);
>
> 2) an EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives" and must explain why it has eliminated an alternative from detailed study, 40 C.F.R. § 1502.14(a) (2000) (emphasis added);
>
> 3) the agency must consider a "no action" alternative, *id*. § 1502.14(d); and
>
> 4) the  agency must designate a "preferred" alternative, *id*. § 1502.14(e).

*Native Ecosystems*, 428 F.3d at 1245-46. "The statutory and regulatory requirements that an agency must consider 'appropriate' and 'reasonable' alternatives does not dictate the minimum number of alternatives that an agency must consider." *Id*. An alternative may be rejected so long as the agency provided an "appropriate explanation" as to why the alternative was eliminated. *Id*. Plaintiffs' claims concerning the Non-Renewal Alternative were dismissed by the March 8, 2013 Decision. Doc. 52 at 10-19. Plaintiffs now move for summary judgment that the EA unlawfully rejected the Reduced Quantity Alternative. Federal Defendants and Defendant Intervenors cross move for summary judgment that Reclamation lawfully decided to reject the Reduced Quantity Alternative.

Reclamation offered four reasons why it rejected the Reduced Quantity Alternative:

> First, the Reclamation Project Act of 1956 and the Reclamation Project Act of 1963 mandate renewal of existing contract quantities when beneficially used. Irrigation and M&I uses are beneficial uses recognized under federal Reclamation and California law. Reclamation has determined that the contractors have complied with contract terms and the requirements of applicable law. It also has performed water needs assessments for all the CVP contractors to identify the amount of water that could be beneficially used by each water service contractor. In the case of each interim renewal contractor, the contractor's water needs equaled or exceeded the current total contract quantity.
>
> Second, the analysis of the PEIS resulted in selection of a Preferred Alternative that required contract renewal for the full contract quantities and took into account the balancing requirements of CVPIA (p. 25, PEIS ROD). The PEIS ROD acknowledged that contract quantities would remain the same while deliveries are expected to be reduced in order to

implement the fish, wildlife, and habitat restoration goals of the Act, until actions under CVPIA 3408(j) to restore CVP yield are implemented (PEIS ROD, pages 26-27). Therefore, an alternative reducing contract quantities would not be consistent with the PEIS ROD and the balancing requirements of CVPIA.

Third, the shortage provision of the water service contract provides Reclamation with a mechanism for annual adjustments in contract supplies. The provision protects Reclamation from liability from the shortages in water allocations that exist due to drought, other physical constraints, and actions taken to meet legal or regulatory requirements. Reclamation has relied on the shortage provisions to reduce contract allocations to interim renewal contractors in most years in order to comply with Section 3406(b)(2) of the CVPIA.

Further, CVP operations and contract implementation, including determination of water available for delivery, is subject to the requirements of Biological Opinions issued under the Federal ESA for those purposes. If contractual shortages result because of such requirements, the Contracting Officer has imposed them without liability under the contracts. Fourth, retaining the full historic water quantities under contract provides the contractors with assurance the water would be made available in wetter years and is necessary to support investments for local storage, water conservation improvements and capital repairs.

Therefore, an alternative reducing contract quantities would not be consistent with Reclamation law or the PEIS ROD, would be unnecessary to achieve the balancing requirements of CVPIA or to implement actions or measure that benefit fish and wildlife, and could impede efficient water use planning in those years when full contract quantities can be delivered.

AR 5011. Plaintiffs attack each rationale in turn.

### (1)   Reclamation Law Mandates Renewal at Existing Quantities When Beneficially Used.

The first reason Reclamation offered for rejecting the Reduced Quantity Alternative was that federal Reclamation Law mandates renewal of the contracts at existing quantities when previously contracted-for quantities can be beneficially used. Reclamation reviewed water needs assessments for all of the relevant contractors and concluded that the contractors' water needs equaled or exceeded the current total contract quantity.

Plaintiffs attack this rationale in several ways. First, Plaintiffs maintain that Reclamation's water needs assessments were flawed because Reclamation failed to take into consideration the fact that substantial acreage had been retired within at least some of the areas served by the contracts at issue in

26

this case. As discussed above, Plaintiffs failed to exhaust their administrative remedies as to this issue, which is not mentioned or hinted at in the Coalition Comment Letter. It will not be considered here.

Next, Plaintiffs argue that even if one assumes Reclamation law requires renewal of the contracts at existing volumes, it is unlawful for an agency to refuse to consider alternatives beyond that agency's authority. Doc. 68-1 at 14-15. In support of this proposition, Plaintiffs cite 40 C.F.R. § 1502.14(c), which provides that an EIS must "include reasonable alternatives not within the jurisdiction of the lead agency." Plaintiffs also cite *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv*., 235 F. Supp. 2d 1143 (W.D. Wash. 2002) ("*NWF v. NMFS*"), which concerned an EIS prepared for a project to dredge sediment from river channels. There, applying 40 C.F.R. § 1502.14(c), the district court found unlawful the action agency's decision to reject an alternative that would have controlled the production of sediment upstream because the acting agency claimed it did not have authority to regulate land use within the vast majority of the basin:

> An agency's refusal to consider an alternative that would require some action beyond that of its congressional authorization is counter to NEPA's intent to provide options for both agencies and Congress. *See Natural Res. Def. Council v. Morton,* 458 F.2d 827, 836 (D.C. Cir. 1972) ("The mere fact that an alternative requires legislative implementation does not automatically establish it as beyond the domain of what is required for discussion, particularly since NEPA was intended to provide a basis for consideration and choice by the decisionmakers in the legislative as well as the executive branch.").

*NWF v. NMFS*, 235 F. Supp. 2d at 1154; *see also Kilroy v. Ruckelshaus*, 738 F.2d 1448, 1454 (9th Cir. 1984) ("In some cases an alternative may be reasonable, and therefore required by NEPA to be discussed in the EIS, even though it requires legislative action to put it into effect.").

However, alternatives requiring legislative action will qualify for inclusion in an EIS "only in very rare circumstances." *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1208-09 (9th Cir. 2004) (*quoting City of Angoon*, 803 F.2d at 1021 n.12). For example, in *Muckleshoot Indian Tribe v. United States Forest Service*, 177 F.3d 800 (9th Cir. 1999), the Ninth Circuit found that the Forest Service should have considered an alternative that would have requested more funds to help protect land impacted by an agency decision. *See id*. at 814. The Ninth Circuit noted that the Forest Service admittedly relied upon

other "speculative" sources of funding, and found troubling the agency's "selective willingness to rely upon the availability of funding sources beyond the Forest Service's direct control." *Id*. Under those circumstances, the Ninth Circuit concluded that it would have been reasonable to consider seeking federal funds as an alternative. *Id*.

In contrast, in *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1207-09 (9th Cir. 2004), no "rare circumstance" required the National Park Service to consider an alternative that would have explored the possibility of obtaining congressional funding to refurbish a historic site. The Ninth Circuit reached this conclusion because the administrative record established that "Park Service planners kept abreast of possible congressional funding sources, were well-informed as to the limitations of these sources, and were, on occasion, successful in obtaining funding," and that the Park Service's decisions "resulted from an informed understanding of Congress's willingness to [provide funding] and a strategic choice about how best to secure whatever funding might be available." *Id*. at 1210. "It was thus reasonable for the []EIS not to have explored in detail the 'alternative' of additional congressional funding beyond what the Park Service had already secured." *Id*. While the plaintiffs "may wish that Congress had been more receptive to the Park Service's requests or that the Park Service could have devised a different and more effective strategy in seeking congressional funding .... this desire alone does not require [the] conclu[sion] that the []EIS is inadequate." *Id*.

The Court does not believe that this case is one of the "rare circumstances" in which the action agency must consider alternatives beyond that agency's existing authority. Here, Reclamation, this Court, and all of the parties to this case are acutely aware of the body of caselaw addressing the interplay between contractual "entitlements" and actual deliveries. As discussed above, Reclamation routinely reduces actual deliveries for a variety of reasons, including fish and wildlife protection. *See generally San Luis*, 672 F.3d 676. In light of the shortage provisions in the contracts that make this possible, there is simply no compelling reason to consider an alternative that would require Reclamation to seek Congressional authorization to reduce contract quantities.

Moreover, the cases discussed above all concern the preparation of an EIS. While an EA is subject to the requirement that a "reasonable range" of alternatives be considered, "an agency's obligation to consider alternatives under an EA is a lesser one than under an EIS." *Native* Ecosystems, 428 F.3d at 1246.

### (2)   Consistency with CVPIA PEIS ROD and Balancing Requirements of the CVPIA.

Reclamation's second rationale for rejecting the Reduced Quantity Alternative was that reducing contract quantities would be inconsistent with the CVPIA PEIS ROD and the "balancing requirements" of the CVPIA.

### (a)   Consistency with the CVPIA PEIS ROD.

It is undisputed that the EA at issue in this case tiers off of the CPVIA PEIS. The EA explains this tiered relationship:

Section 3404(c)(1) of the Central Valley Project Improvement Act (CVPIA) authorizes and directs Reclamation to prepare appropriate environmental review before renewing an existing water service contract for a period of twenty-five years. Interim renewal contracts have been and continue to be undertaken under the authority of the CVPIA to provide a bridge between the expiration of the original long-term water service contracts and the execution of new long-term water service contracts as required by the CVPIA. The interim renewal contracts reflect current Reclamation law, including modifications resulting from the Reclamation Reform Act and applicable CVPIA requirements. The initial interim contract renewals were negotiated in 1994 with subsequent renewals for periods of two years or less to provide continued water service. Many of the provisions from the interim contracts were assumed to be part of the contract renewal provisions in the description of the CVPIA Programmatic Environmental Impact Statement (PEIS) Preferred Alternative.

The PEIS did not analyze site specific impacts of contract renewal but rather Central Valley Project (CVP)-wide impacts of long-term contract renewal. Consequently, as contract renewal negotiations were completed, Reclamation prepared environmental documents that tiered from the PEIS to analyze the local effects of long-term contract renewals at the division, unit, or facility level. Tiering is defined as the coverage of general matters in broader environmental impact statements with site-specific environmental analyses for individual actions. Environmental analysis for the interim renewal contracts has also tiered from the PEIS to analyze site specific impacts. Consequently, the analysis in the PEIS as it relates to the implementation of the CVPIA through contract renewal and the environmental impacts of implementation of the PEIS Preferred Alternative are foundational and laid the groundwork for EA-11-049. The PEIS analyzed the differences in the environmental conditions between existing contract requirements (signed prior to CVPIA) and the No Action Alternative described in EA-11-049 which is reflective of minimum implementation of the CVPIA.

AR 4986 (emphasis added).

The CVPIA PEIS analyzed a number of alternatives designed to evaluate implementation of the various programs authorized and required by the CVPIA, including contract renewal and implementation of programs designed protect and restore fish and wildlife populations. While the various alternatives differed in many respects, all (including the No Action Alternative) assumed contract renewal would take place at full, pre-CVPIA quantities, at least with respect to the contractors at issue in this case. *See* AR 2341-44. The CVPIA selected a "Preferred Alternative" that incorporated these assumptions about contract renewal at pre-CVPIA quantities, AR 2436, yet acknowledged that the CVPIA's programs would result in reduced water deliveries to CVP contractors, *see* AR 2445. Therefore, the CVPIA PEIS ROD impliedly adopts the background assumption that Reclamation has taken in many other contexts: water service contract quantities do not control deliveries.

In the EA, Reclamation asserts that evaluating a Reduced Quantity Alternative would be inconsistent with the CVPIA PEIS ROD. AR 5011. This is a reasonable conclusion. The CVPIA PEIS ROD adopted a Preferred Alternative that assumed renewal of the contracts at existing quantities. It would be problematic at best to discuss in an EA tiering off of the CVPIA PEIS alternatives that are inconsistent with the Preferred Alternative adopted in the CVPIA PEIS ROD.[10]

### (b)   Consistency with the CVPIA's Balancing Goal.

Relatedly, the CVPIA PEIS ROD concluded that "[a]chieving a reasonable balance among competing uses is a principle purpose of the CVPIA, as provided under [CVPIA] section 3402(f)." AR 2441. "Each Final PEIS alternative combined various elements that modified this balance to some degree, thereby providing the decision maker a reasonable range of choices based on analyses in the Final PEIS and associated public involvement." *Id*.

---

[10] If Plaintiffs dispute the lawfulness of the choices made in the 2001 CVPIA PEIS ROD, they had six (6) years in which to challenge those choices. If they now believe circumstances have changed such that the choices made in the CVPIA PEIS ROD must be re-evaluated, then they can pursue that argument in a separate lawsuit seeking supplemental environmental analysis of the CVPIA's programs.

The CVPIA PEIS ROD explains why the Preferred Alternative "best balances environmental benefits, affordability, and technical feasibility" and why the modifications to the Preferred Alternative set forth in the ROD "provide[] the greatest level of a reasonable balance among competing demands for CVP water....":

> The No Action Alternative was not a feasible alternative because it would not meet the purposes of the CVPIA as defined in section 3402. The No-Action Alternative is only used as a basis for comparison of other alternatives and includes projects and policies that would either be impacted by the CVPIA or that would impact implementation of the CVPIA.
>
> Alternative 1 through 4 were not chosen for implementation because they did not provide the greatest benefits for fish and wildlife, the greatest improvement to operational flexibility, or the greatest level of a reasonable balance among competing demands for CVP water consistent with reasonable assumptions in the analyses of the CVPIA PEIS[.]
>
> Of all alternatives in the Final PEIS, the Preferred Alternative in the Final PEIS provided the greatest benefit for fish and wildlife, consistent with reasonable assumptions in the analysis of the CVPIA Final PEIS. The Preferred Alternative was defined in response to results of the Draft PEIS analyses, public comments received on the Draft PEIS and the supplement to the Draft PEIS, public comments received on related Administrative Proposals, and results of interim implementation of several CVPIA provisions. The Preferred Alternative was constructed to implement the CVPIA in a manner that best balances environmental benefits, affordability, and technical feasibility. By increasing the overall water-related benefits provided by CVP and by addressing impacts of the CVP on fish and wildlife resources, the Preferred Alternative would also contribute to the overall economic and environmental sustainability of California. Implementation of the CVPIA would result in a variety of impacts to the regional economy and social conditions in a large area of California. The Preferred Alternative did not include provisions that would either clearly exceed reasonable assumptions in the analyses of the CVPIA PEIS or require additional Congressional authorization.
>
> This Decision builds on the Preferred Alternative by increasing flows in the San Joaquin River, improving efficiency and effectiveness of the AFRP through adaptive management, and by providing a Land Retirement Demonstration Study that will result in more effective and efficient implementation of the long term Land Retirement Program. This Decision provides the greatest benefit for fish and wildlife, within the funding limits of the Act, including the following:
>
> > • The combined effects of increased instream flows, lower instream water temperatures, habitat restoration, and structural improvements will

31

improve food web and habitat quality and quantity, improve fish passage and access, reduce water diversion effects, and increase anadromous fish survival in Central Valley rivers, their tributaries, and the Delta.

• Level 2 water deliveries will improve wetland management for water birds and shore birds. Additional wetland management improvements will occur as a result of water acquisition under section 3406(b)(3), and minor wetland benefits will occur as a result of changes in river hydrologies associated with anadromous fish restoration efforts.

• Retirement of agricultural land will improve the distribution and number of common wildlife, provide potential habitat for special-status species associated with grassland and alkali desert scrub habitats, and will reduce the use of herbicides and insecticides on these lands which will provide additional benefits to fish and wildlife.

• Increased spring flows on the tributaries to the San Joaquin River will improve riparian habitat for riparian-dependent species along the San Joaquin River, and riparian restoration on the Sacramento and San Joaquin rivers and their tributaries will improve habitat for dependent common and special-status fish and wildlife species.

• Implementation of the (b)(1) "other" Program will provide additional restoration and enhancement actions for species and habitats impacted by the CVP and not specifically addressed in section 3406 of the CVPIA.

This Decision also improves operational flexibility, and will improve water quality and biological conditions in the Bay-Delta due to CVP reoperation, (b)(2) water management, and acquisition of supplemental water for fish and wildlife under section 3406(b)(3) as provided under section 3402(e). This Decision provides the greatest level of a reasonable balance among competing demands for CVP water because it provides increased instream flows and Delta outflows, refuge water supplies, and water transfers consistent with reasonable assumptions in analyses of the CVPIA PEIS, while minimizing, as possible, impacts to CVP deliveries and power generation.

AR 2444-45 (emphasis added). Plaintiffs do not directly attack this rationale.

### (3) Shortage Provision Provides A Mechanism to Adjust Contract Supplies.

The EA also correctly asserts that each of the water service contracts at issue in this case incorporates a shortage provision that "provides Reclamation with a mechanism for annual adjustments in contract supplies." AR 5011. As the EA explains:

The provision protects Reclamation from liability from the shortages in water allocations that exist due to drought, other physical constraints, and actions taken to meet legal or regulatory requirements.

*Id*. Plaintiffs do not actually challenge the substance of these assertions. Rather, they contend that this

amounts to "an admission that reducing deliveries is viable, rather than a reason not to study the environmental consequences of doing so." Doc. 68-1 at 16. Plaintiffs' argument continues:

> Reclamation cannot evade its NEPA obligations to analyze the environmental consequences of its water delivery decision before approving the contracts just because it also has authority to adjust contract quantities after contract approval. This is antithetical to NEPA's informational purpose.

*Id.*

This argument might hold force were it not for the line of Ninth Circuit authority indicating that agency actions that do not alter the status quo *ipso facto* do not have a significant impact on the environment. Here, the Court has previously determined that renewal of the Interim Contracts <u>does not alter the status quo</u>. When Reclamation makes decisions that actually impact how much water to <u>deliver</u> pursuant to these contracts, NEPA requires Reclamation to evaluate the environmental impacts of such decisions. *See San Luis & Delta-Mendota Water Auth. v. Salazar*, 686 F. Supp. 2d 1026, 1051 (E.D. Cal. 2009) (finding that Reclamation violated NEPA by failing to perform any NEPA analysis prior to provisionally adopting water supply measures designed to protect delta smelt that could adversely impact the environment in other ways). It was therefore reasonable for Reclamation to rely on the fact that the contracts permit delivery reductions to occur as a justification for refusing to consider a Reduced Quantity Alternative.

### (4)   Retaining Full Contract Water Quantities Provides Assurance of Deliveries in Wetter Years.

Relatedly, the EA further justifies rejecting the Reduced Quantity Alternative because "retaining the full historic water quantities under contract provides the contractors with assurance the water would be made available in wetter years and is necessary to support investments for local storage, water conservation improvements and capital repairs." AR 5011. Plaintiffs argue: "this is not a reason why reducing contract quantities is infeasible. It is a policy decision by Reclamation to promote the economic security of agricultural users rather than devote more water to environmental purposes." Doc. 68-1 at 16. Plaintiffs are correct that this is a policy-driven rationale designed to maximize possible deliveries when operational conditions permit. Plaintiffs are also correct that reducing contract quantities might make it

possible to devote more water to environmental purposes, but Plaintiffs totally fail to acknowledge that this is not a policy of Reclamation's invention. Congress articulated this policy in the CVPIA. "The CVPIA represented a compromise between competing needs for limited CVPIA yield. It dedicated 800,000 AF of CVP yield to fish and wildlife restoration purposes." *San Luis & Delta-Mendota Water Auth. v. U.S. Dep't of Interior*, 637 F. Supp. 2d 777, 793 (E.D. Cal. 2008) on reconsideration, 624 F. Supp. 2d 1197 (E.D. Cal. 2009) aff'd sub nom. San Luis & Delta-Mendota Water Auth. v. United States, 672 F.3d 676 (9th Cir. 2012) and aff'd sub nom. *San Luis & Delta-Mendota Water Auth. v. United States*, 672 F.3d 676 (9th Cir. 2012). Although the Ninth Circuit's most recent decision addressing the CVPIA's 800,000 AF dedication gives Reclamation some flexibility to dedicate more than 800,000 AF of CVP yield to fish and wildlife purposes, Reclamation's authority to do so is not unlimited and likely only extends to actions required to satisfy particular legal obligations. *See San Luis*, 672 F.3d at 705-15. The EA's decision to reject a Reduced Quantity Alternative because issuing contracts at full quantity provides contractors with assurance of deliveries in wetter years is at least arguably consistent with Congressional policy set forth in the CVPIA. Reclamation's decision to rely on this rationale is reasonable.

(5) **Conclusion Re: Reclamation's Elimination of the Reduced Quantity Alternative.**

An alternative may be rejected so long as the agency provided an "appropriate explanation" as to why the alternative was eliminated. *Native Ecosystems*, 428 F.3d at 1245-46. Plaintiffs cite *Klamath-Siskiyou Wildlands Center v. U.S. Forest Serv.*, 373 F. Supp. 2d 1069 (E.D. Cal. 2004), in support of their contention that Reclamation's explanations for rejecting the Reduced Quantity Alternative are not appropriate. *Klamath-Siskiyou* involved a proposed timber harvesting plan that would have generated money to be utilized for watershed improvement. *Id*. at 1072-73. The Forest Service considered three alternatives to the proposed action: a no action alternative, and two alternatives that were "nearly identical," only modifying the rate of harvest in a certain area and slightly altering mitigation measure. *Id*. at 1088. The Forest service rejected any proposed alternatives that would have eliminated or reduced

34

the amount of timber harvest on the ground that those alternatives "would have been uneconomical and thereby limited funds for restoration work." *Id*. The Ninth Circuit found this explanation to be insufficient because "nowhere in the EA does the Forest Service provide any analysis regarding the amount of revenue lost under each of the various alternative approaches, how much it will cost to complete the desired improvement projects, and what percentage of required funding must to be generated through timber sales. Rather, it appears the Forest Service simply dismissed out of hand any proposal which would have reduced the amount of timber harvest." *Id*. This did not constitute a "hard look" at reasonable alternatives.

The present case is very different. The EA challenged here is tiered to the 2001 CVPIA PEIS. The CVPIA PEIS ROD selected a Preferred Alternative that assumes full contract <u>quantities</u>, while simultaneously indicating that <u>deliveries</u> would be reduced to implement the CVPIA. Reclamation has been operating the CVP pursuant to that ROD since its adoption in 2001. Reclamation's decision to reject an alternative that conflicted with the ROD does not amount to a "dismissal out of hand" of a feasible alternative. Rather, Reclamation acted reasonably to maintain consistency with a prior, foundational decision. The Court finds this rationale, standing alone, to be an "appropriate explanation" for Reclamation's decision to eliminate the Reduced Quantity Alternative from further consideration. The additional reasonable explanations offered by Reclamation only further support that decision.

Plaintiffs' motion for summary judgment that Reclamation unlawfully rejected the Reduced Quantity Alternative is DENIED; Federal Defendants' and Defendant Intervenors' cross motions are GRANTED.

### b. <u>Alternatives Considered Are Nearly Identical.</u>

Relatedly, Plaintiffs argue that consideration of nearly identical alternatives makes it impossible for the agency to "make an informed decision on the project's environmental impacts." Doc. 85 at 14 (quoting *Western Watersheds Project v. Abbey*, 719 F.3d 1035, 1051 (9th Cir. 2013)). In *Western Watersheds* the BLM prepared an EA addressing renewal of grazing permits at a specific site within a National Monument. *Id*. at 1050-51. The BLM considered three alternatives and one no-action

alternative. The three action alternatives each considered issuing new grazing permits at the same

grazing level as the previous permit. *Id.* at 1050. The BLM also considered, but did not analyze in detail,

alternatives that would provide for no grazing, reduced grazing, and alternative management strategies.

*Id*. The Ninth Circuit found that the range of alternatives considered was unreasonable, "question[ing]

how an agency can make an informed decision on a project's environmental impacts when each

alternative considered would authorize the same underlying action -- permitting grazing at the [previous]

level...." *Id*. at 1051.

At first glance, there appear to be parallels between this case and *Western Watersheds*. There is

one critical distinction, however. *Western Watersheds* concerned approval of a permit, the issuance of

which would directly cause an impact to the environment from grazing. Here, Reclamation's renewal of

the Interim Contracts does no such thing, because, as discussed above, the contracts <u>do not actually</u>

<u>control delivery of water</u>. Therefore, Reclamation focused instead on alternatives that would compare

contract terms (e.g. pricing provisions) that are likely to make a practical difference. This approach was

reasonable.

Plaintiffs' motion for summary judgment that Reclamation acted unlawfully by considering only

alternatives that were "nearly identical" to one another is DENIED; Federal Defendants' and Defendant

Intervenors' cross motions are GRANTED.

**D.**     <u>**Challenges to Impacts Analysis.**</u>

Plaintiffs move for summary judgment that the EA is inadequate because it fails to address

impacts beyond the water delivery area. Doc. 68-1 at 18. Plaintiffs are correct that NEPA requires the

action agency to "analyze <u>all</u> of the environmental consequences of a project." *Save Our Sonoran v.*

*Flowers*, 408 F.3d 1113, 1122 (9th Cir. 2004) (emphasis added). It is therefore unlawful for an agency to

artificially circumscribe the geographic scope of a NEPA analysis. *Id.* In *Save Our Sonoran*, for

example, the Ninth Circuit set aside an Army Corps of Engineers' EA reviewing the environmental

impacts of issuing a dredge and fill permit, because the EA only evaluated impacts on desert washes

under the Corps' jurisdiction. *Id*. Because impacts to these "jurisdictional waters" would in turn impact a

36

larger property, the Corps was required to evaluate impacts to the larger property. *Id*.

Here, however, as discussed above, the picture is complicated by the fact that the present EA tiers off the CVPIA PEIS. The CVPIA PEIS, which was issued in 1999, is not part of the administrative record in this case, nor could the Court readily locate its entire text online. However, the executive summary, which is readily available and subject to judicial notice for its content,[11] indicates:

> The PEIS is intended to provide the basis for a decision on whether to implement at the programmatic level provisions of CVPIA, including:
>
> - Water contract renewals
> - Water Transfers
> - Tiered water pricing
> - CVP Operations
> - Fish and Wildlife Water Acquisition
> - Fish and Wildlife habitat restoration
> - Water Acquisition to Increase Refuge Water Supplies
> - Land Retirement
> - Facility Modifications
>
> For many provisions, additional environmental documentation will be necessary to determine site-specific impacts. The PEIS is designed to allow subsequent environmental documents to incorporate PEIS analysis by reference and to limit the need to re-evaluate the region-wide and cumulative impacts of CVPIA.

CVPIA PEIS Executive Summary at 20, available at http://www.usbr.gov/mp/cvpia/docs_reports/fpeis/ fpeis_full_doc.pdf (last visited February 5, 2014).

Tiering, which is permitted under NEPA, is described in the CEQ regulations at 40 C.F.R. § 1508.28:

> "Tiering" refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared.

---

[11] While readily available public records such as this are subject to judicial notice, *San Luis & Delta–Mendota Water Auth. v. Salazar*, 686 F. Supp. 2d 1026, 1031 (E.D. Cal. 2009) the Court takes judicial notice of this public record "for the purpose of determining what statements are contained therein, not to prove the truth of the contents or any party's assertion of what the contents mean." *United States v. S. Cal. Edison Co*., 300 F. Supp.2 d 964, 975 (E.D. Cal. 2004).

Tiering only obviates the need for independent environmental impact analysis if the document tiered to actually addresses the potential impacts of the proposed action. For example, in *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 997-98 (9th Cir. 2004), the action agency tiered EA to a regional EIS in order to evaluate the impacts of approving several timber sales. However, although the tiered to regional EIS did "contain[] general statements about the [] effects of logging across the [region]" neither the regional EIS nor the challenged EA revealed the "impact that can be expected on the [] watershed as a result of each of [the challenged] timber sales." *Id*. at 997. Critically, the record in *Klamath-Siskiyou* revealed "the potential for [] serious impacts ... such that the subject require[d] more discussion than the[] EAs [alone] provide." *Id*.

Here, however, the Court cannot find that renewal of the Interim Contracts has the potential for serious impacts because doing so would conflict with the law of the case, namely the previous finding that the Interim Contract renewals did not change the status quo. This previous conclusion effectively dooms Plaintiffs' challenge to the content of the EA's impact analysis. A similar conclusion was reached in *Sabine River Auth. v. U.S. Dept. of Interior*, 745 F. Supp. 388 (E.D. Tex. 1990), the only case this Court has been able to locate that independently analyzed challenges to the content of an EA after rejecting a challenge to an action agency's failure to prepare an EIS on the ground that the project did not alter the status quo. *Sabine* concerned the U.S. Fish and Wildlife Service's issuance of an EA and FONSI in connection with its decision to acquire certain conservation easements. The district court found that the action would not change the status quo because the purpose of acquiring the easements was to "foreclose any change in the physical environment." *Id*. at 394. As a result, the district court also rejected plaintiffs' contention that the action agency failed to consider the acquisition of the easements sets a precedent for acquisitions of additional easements in the future, reasoning: "To the extent that the acquisition of this easement sets a precedent for acquisitions of additional conservation easements by the FWS, such future actions would not have 'significant effects' under NEPA because the acquisition of such easements does not cause any 'change in the physical environment.' " *Id*. at 402. Although the basis for the status quo finding in this case is distinct from the basis for that finding in *Sabine*, the end

38

result is the same. An action that does not change the status quo cannot cause any change in the environment and therefore cannot cause effects that require analysis in the EA.

This conclusion applies with equal force to Plaintiffs' additional challenges to the content of the EA's impact analysis and cumulative impact analysis, including Plaintiffs' arguments that: (1) that the EA contains no analysis of the impact of agricultural runoff and subsurface drainage from Westlands' CVP-irrigated lands, which according to Plaintiffs "contaminates the San Joaquin River and thence the Delta with selenium and other toxic substances," Doc. 68-1 at 19; and (2) that the EA's cumulative impacts analysis is inadequate because, among other things, "selenium bioaccumulates, meaning that continued additions of the same quantity of selenium have compounding environmental impacts," *id*. at 24. The Court expresses no opinion as to the scientific validity of these arguments. Rather, the Court declines to address these arguments on the merits because they are untimely presented in this litigation. Having previously found that the renewal of the Interim Contracts does not change the status quo and therefore cannot have a significant impact on the environment, the Court cannot now find that the EA's analysis of the Interim Contract's effects on the environment is insufficient.

Plaintiffs do raise one line of argument about the content of the EA's impact analysis that is not directly undermined by the previous status quo ruling. Plaintiffs point out, correctly, that the EA states that "impacts to salmonid species and green sturgeon in the Delta are solely the result of CVP operations, and are addressed in the CVP/State Water Project Coordinating Operations ["OCAP"] consultation," which resulted in the issuance of an ESA biological opinion on the subject. AR 4988. Interpreting this as an attempt by Reclamation to skirt its responsibility to evaluate impacts to Delta fish species by incorporating the OCAP BiOp by reference, Plaintiffs argue that it is per se impermissible for an EA to incorporate documents by reference. In support of this argument, Plaintiffs cite, *National Resources Defense Council v. Duvall*, 777 F. Supp. 1533, 1538-39 (E.D. Cal. 1991), which appears to hold that while incorporation by reference may be appropriate in certain circumstances in an EIS, EA's

conclusions should "be close to self-evident," rendering incorporation of other studies inappropriate.[12]

Even assuming the requirements governing incorporation by reference into EISs are also applicable to EAs, Plaintiffs maintain that Reclamation failed to satisfy those requirements. Doc. 68-1 at 20. According to *Duvall*, incorporated documents must satisfy "three standards: 1) the material is reasonably available; 2) the statement is understandable without undue cross reference; and 3) the incorporation by reference meets a general standard of reasonableness." *Duvall*, 777 F. Supp. at 1539. Plaintiffs argue that Reclamation's EA fails to meet this standard because it "neither summarizes the outside documents nor tells the reader where they can be obtained." Doc. 68-1 at 20. This entire line of reasoning exhibits a total misunderstanding of the point of Reclamation's reference to the OCAP BiOp. Reclamation was not "incorporating" the OCAP BiOp into its reasoning at all, because the EA was not required to evaluate CVP-wide impacts to biological resources caused by water <u>deliveries</u>. The EA was simply pointing out where such evaluations could be found. Therefore, the incorporation by reference rules do not apply.[13]

Finally, Plaintiffs point to statements in the AR suggesting that at least the U.S. Fish and Wildlife service assumed that contract renewal would be subject to tiered NEPA analysis. For example, the November 2000 BiOp issued in connection with implementation of the CVPIA indicated:

> Subsequent tiered consultations, addressing future actions or programs carried out by Reclamation (e.g. contract renewal), shall consider what incremental effect, if any, such action or program causes in addition to the effects included in the existing environmental baseline and not impacts that may result from past actions of operation and maintenance of the CVP.

AR 569. Elsewhere the CVPIA BiOp states:

---

[12] In apparent contrast to the main body of the decision, a footnote in *Duvall* finds that the regulations permitting incorporation by reference in an ES appear to apply by analogy to an EA. *Duvall*, 777 F. Supp. at 1539 n. 13.

[13] Relatedly, the EA notes that high selenium levels in groundwater could potentially affect the California least tern and giant garter snake "through accumulation in the food chain as they prey on small fish." AR 5029. The EA notes that "[o]n February 29, 2012, the USFWS issued a biological opinion which found that the remaining interim renewal contracts may affect, but is not likely to adversely affect the San Joaquin kit fox, blunt-nosed leopard lizard, and the San Joaquin woolly threads and would not jeopardize the continued existence of the giant garter snake and the California least tern...." *Id*. Plaintiffs argue that this analysis is insufficient because it impermissibly conflates a no jeopardy finding with the absence of a "significant effect." Doc. 84 at 17. As discussed above, however, this argument has been waived because Plaintiffs failed to raise it (even in a general sense) in their comment letter.

> Once the long-term contract renewal negotiations are completed, the renewals will be subject to a separate, tiered analysis that is consistent with the NEPA tiering in the PEIS. No contracts will be renewed until the appropriate environmental review has been completed. Reclamation will consult either formally or informally with the Service before executing a contract. The site specific, tiered analysis will address direct and indirect effects of contract renewal.

AR 609. The legal significance of these passages, present in a document not authored by Reclamation, is unclear. But, even if they are relevant to the inquiry regarding the necessity of preparing an EIS in this case, that train has left the station, at least in this litigation. The Court ruled in March 2013 that the EIS claim could not proceed because the Interim Contracts did not modify the status quo. Plaintiffs failed to move for reconsideration and make no serious suggestion of doing so in the context of these cross-motions. As discussed above, that ruling has consequences for Plaintiffs case. This Court will not here consider arguments that, if accepted, would conflict with its previous dismissal of the EIS claim. Accordingly, Plaintiffs' motion for summary judgment that the EA's effects analysis and cumulative effects analysis is flawed is DENIED; Federal Defendants' and Defendant-Intervenors' Cross motions are GRANTED.

## VI. <u>CONCLUSION AND ORDER</u>

For the reasons set forth above:

(1) The Court's March 8, 2013 dismissal of Plaintiffs' claim that Reclamation unlawfully failed to prepare an EIS is law of the case and the key reasoning underlying that ruling (i.e., that renewal of the Interim Contracts will not change the status quo), renders many of Plaintiffs' arguments on summary judgment untimely.

(2) Defendant Intervenors' motion for summary judgment that certain of Plaintiffs' arguments have been waived for failure to exhaust is GRANTED IN PART AND DENIED IN PART;

(3) Plaintiffs' motion for summary judgment on the merits of their remaining NEPA claim is DENIED;

(4) Federal Defendants' and Defendant-Intervenors' cross motions for summary judgment on the merits of Plaintiffs' remaining NEPA claim are GRANTED.

(5) The Clerk of Court is directed to enter judgment for Federal Defendants and Defendant Intervenors and against Plaintiffs.

IT IS SO ORDERED.

Dated:   **February 6, 2014**             **/s/ Lawrence J. O'Neill**
                                          UNITED STATES DISTRICT JUDGE